# COCHRAN AND SAYRE v. UNITED STATES.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF COLORADO.

No. 815. Argued and submitted March 4, 1895. — Decided March 25, 1895.

In an indictment against the president and the assistant cashier of a national bank for making a false entry in a report, under Rev. Stat. § 5209, the report need not be described with technical accuracy; nor is it necessary to allege that the report in which the false entry was made was verified by the oath or affirmation of the president or cashier, or attested by the signature of the directors.

In such an indictment the true test is, not whether it might possibly have been made more certain, but whether it contains every element of the

offence intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet, and, in case any other proceedings are taken against him for a similar offence, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction.

Several objections to the admissibility of evidence considered and disposed of.

A note whose payment is guaranteed by a national bank is a liability of the bank which is required by law (Rev. Stat. § 5211) to be shown in the report to the Comptroller of the Currency.

Some objections to the charge considered and disposed of.

The defendants requested the court to charge the jury as follows: "You are further instructed that the defendants are presumed to be innocent until the contrary appears beyond a reasonable doubt, and that every reasonable doubt or presumption arising from the evidence must be construed in their favor." The court refused to give this instruction, but instead thereof gave a carefully prepared definition of reasonable doubt, without referring to the presumption of innocence which attends an accused at every stage of the proceeding. *Held,* following *Coffin* v. *United States,* 156 U. S. 432, that this was error, as the defendants were entitled to an instruction upon the point of the presumption of innocence, if requested.

THIS was a writ of error to review a conviction of William H. Cochran, president, and Robert H. Sayre, assistant cashier, of the First National Bank of Del Norte, Colorado, for making a false entry in a report to the Comptroller of the Currency. On November 22, 1893, the grand jury presented three separate indictments against the plaintiffs in error, which were numbered 959, 960, and 992 respectively. These indictments were identical in language, except so far as it was necessary to change them, so that the plaintiffs in error could both be charged as principals, and as accessories of each other. In No. 959, both were charged as principals, for making false entries in their reports. In No. 960, Sayre was charged with making, and Cochran with aiding, abetting, and procuring Sayre to make such false entries; and in No. 992, Cochran was charged with making, and Sayre as an accessory.

Each indictment contained twelve counts, and on motion to quash, the tenth, eleventh, and twelfth counts of each indictment were held to be insufficient. On May 11, 1894, the three indictments were consolidated and tried as one, and on

June 6, 1894, the defendants were convicted upon the first count of the indictment originally numbered 960.

Whereupon defendants sued out this writ of error.

*Mr. E. F. Richardson*, (with whom was *Mr. Charles S. Thomas* on the brief,) for plaintiffs in error.

*Mr. Solicitor General*, for defendants in error, submitted on his brief.

Mr. Justice Brown delivered the opinion of the court.

As the defendants were convicted solely upon the first count in indictment No. 960, it is only necessary to consider the questions arising upon this count.

1. The first assignment of error relates to the sufficiency of this count, which charges that " Robert H. Sayre, . . . William H. Cochran being then and there president, the said Robert H. Sayre being then and there assistant cashier of the First National Bank of Del Norte, Colorado, . . . did make, in a certain report of the condition of the First National Bank, . . . at the close of business on the 30th of September, 1892, made to the Comptroller of the Currency in accordance with the provisions of section 5211 of the Revised Statutes of the United States, a certain entry."

The first objection to the indictment is that as section 5211, referred to in this count, provides that "every *association* shall make to the Comptroller of the Currency not less than five reports during each year, according to the form which may be prescribed by him, verified by the oath or affirmation of the president or cashier of such association, and attested by the signature of at least three of the directors," the indictment should aver that the report was made by the *association*. The offence charged, however, is not the making or the failure to make the report under section 5211, the failure to make which report subjects such association to a penalty under section 5213, but the making of a false entry in a report, under section 5209, which provides that "every president, director, cashier, teller, clerk, or agent of any association,"

who makes any such false entry in any report, shall be guilty of a misdemeanor. Section 5209 is the statute violated, and the reference to section 5211 is merely for the purpose of identifying the report, as one required by law to be made. In addition to this, the indictment refers to the report as one made "in accordance with the provisions of section 5211," which would imply that it was made by the association, and was properly verified and attested, as required by that section. Had the indictment been against the association for a failure to make such reports, it would doubtless be necessary to aver that the report was required to be made by the association, but as the report is mentioned only for the purpose of showing that it was one required by law to be made, it need not be described with technical accuracy.

2. The second objection is that Sayre had no authority to make the report, being only an assistant cashier. While, under section 5211, the report in question ought to be made by the association, verified by the oath or affirmation of the president or cashier, and attested by the signature of three directors, it was no less an offence, under section 5209, for an assistant cashier to make a false entry in a report which was to be subsequently verified by the oath of the president or cashier in person, than it would have been if the entry had been made by the cashier who verified the report. As the language of section 5209 applies not only to the president and cashier, but to any director, teller, or agent of any such association, Sayre as assistant cashier certainly fell within the category of clerk or agent. If he made a false entry in a report required by section 5211, it made no difference whether the report was subsequently verified by him, or by the president or cashier in person. There is no penalty affixed by section 5211 to the false verification of the president or cashier. The offence is in making the false entry, with intent to injure or defraud the association, etc.

For the reason above given, we do not think it necessary to allege that the report in which the false entry was made was actually verified by the oath or affirmation of the president or cashier, or attested by the signature of the directors

— or at least that the fact that it is averred to have been made "in accordance with the provisions of section 5211" is a sufficient averment that it was properly verified and attested. If such report were not properly verified and attested, it would doubtless be competent for the Comptroller of the Currency to reject it, or to proceed against the association under section 5213 for failure to make and transmit a proper report. But, if an assistant cashier makes a false entry in a report, which is designed to be and is made use of as a report to the Comptroller of the Currency under section 5211, it is difficult to see why it is not equally an offence, if the Comptroller of the Currency chooses to accept such report without the proper attestation and verification.

These cover all the objections taken to the indictment in the brief of defendants' counsel.

Few indictments under the national banking law are so skilfully drawn as to be beyond the hypercriticism of astute counsel — few which might not be made more definite by additional allegations. But the true test is, not whether it might possibly have been made more certain, but whether it contains every element of the offence intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet, and, in case any other proceedings are taken against him for a similar offence, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction. *Evans* v. *United States*, 153 U. S. 584, 587, 588; *Batchelor* v. *United States*, 156 U. S. 426.

3. Error is assigned to the ruling of the court permitting the district attorney to ask of the witness Charles W. Thomas whether he had ever had any experience in a bank, or the business of a bank, before he came to Colorado. Thomas, who, it subsequently appears, was made cashier of the bank, gave evidence tending to prove that he first met Cochran in the summer of 1889, on a visit to Colorado, and that since May 1, 1890, he had lived at Del Norte. He was then asked the question, "Had you ever had any experience in a bank, or the business of a bank, before you came to Colorado?" There was no error in permitting this interrogatory to be

put. Questions regarding the age, antecedents, business, and experience of a witness are largely within the discretion of the court, and unless it manifestly appears that such questions are put for an improper purpose, such discretion is not reviewable on error. The weight to be given to the testimony of this witness as to the entries in question might depend largely, not only upon his intelligence, but upon his familiarity with the banking business. If he were a man of previous experience in banking, he would be the better qualified to explain to the jury the significance of the entries in question, and the manner in which the reports to the Comptroller of the Currency were made up. If, upon the other hand, he were appointed, because of his inexperience, as a merely perfunctory official, and because he was intended to be made use of as a tool of the defendants in carrying out their plans, this was a fact which the jury were entitled to know, and an item of testimony having some bearing upon the intent to defraud in making the false entry in question.

4. The objection to the following question put to Thomas is equally untenable: " When the Comptroller would call on the bank for statements, what was your habit as to taking any part in the getting up of such statement?" His answer, " I never made any statements," shows of itself that the question was not prejudicial in the answer actually given. If this be the case, the materiality or propriety of the question is of no importance. Beyond this, however, the witness was the cashier of the bank, and was required by section 5211 to verify the reports to the Comptroller of the Currency. Naturally, he was the one to prepare these reports, or at least to take part in preparing them, and if he were not called upon to do so, the fact was at least deserving of explanation, and properly the subject of comment by counsel. The pertinence of the question was manifest in view of his subsequent testimony that " the statements were handed to him, and they told him that the statements were all right, and he would sign them. . . . The reports were never made out by witness, but by some one else. They were made out mostly by Sayre, sometimes under the direction of Cochran, and sometimes written out by other

parties in the bank.. . . . Either Cochran or Sayre told him that the statements were all made out ready to sign, and he signed them without examining them, as they were handed to him, and without assisting in their preparation, or comparing them with the books of the bank."

5. So also the question that was put to the witness when shown a note of the Hanover National Bank, which he testified was filled out and signed in the handwriting of the defendant Sayre, as to whether it was a rediscounted note, was perfectly proper, although objected to upon the ground that the witness had shown an entire lack of qualification to pass upon the question whether the note was a rediscount or not. As it appears that the witness had been acting cashier in the bank for two months, even if he had had no prior experience, he could. hardly have failed in that time to be competent to express an opinion as to whether a note was a rediscount or not. The weight to be given to his testimony was of course a question for the jury.

6. The fifth assignment is to the introduction of the report of the bank of September 30, 1892, to the Comptroller of the Currency, which was objected to upon the ground, *first*, that the indictment charged the defendants, one as president and the other as assistant cashier, with making the reports, while the report in question appears to have been made and verified by Charles W. Thomas, as cashier, and to have been signed by different parties as directors; *second*, because neither of the defendants could be convicted under the indictments as principals in making the said reports, but only as accessories, if at all; *third*, because no one except he who verified the reports could be convicted under this indictment; and that the defendants were charged with having, as president and assistant cashier, made the false reports and entries therein, whereas the statements offered were signed by defendant Cochran as a director, while. the defendant Sayre did not sign the reports at all.

The *first* objection is untrue as a matter of fact. The indictment does not charge the defendants with making a false report, but that they " did make in a certain report . . . a certain

entry, under the head of 'liabilities' and . . . that the said entry so made as aforesaid was then and there false."

The argument of the defendants assumes that the making of the entry, and the making of the report, are the same thing, whereas in fact they are wholly different. By section 5211, the report must be made by the *association*, and must be verified by the oath or affirmation of the president or cashier, and attested by the signature of at least three of the directors. But, under section 5209, there is no penalty affixed to the association or its officers for making a false report, nor to the president or cashier for verifying such report. The penalty imposed by section 5209 is affixed to the one who makes any false entry in any book, report, or statement of the association; and that penalty is applicable to any officer or agent of the bank, who actually makes the entry, with intent to injure or defraud, or to deceive any agent appointed to examine the affairs of any such association. As was observed by Mr. Justice Woods in *United States* v. *Britton*, 107 U. S. 655, 662, to describe the offence of making a false entry requires the pleader to aver " (1) that the accused was the president or other officer of a national banking association, which was carrying on a banking business; (2) that being such president or other officer, he made in a book, report, or statement of the association, describing it, a false entry, describing it; (3) that such false entry was made with intent to injure or defraud the association, or to deceive any agent, describing him, appointed to examine the affairs of the association." The indictment in this case is a substantial copy of that approved by this court in the *Britton case*, except that the false entry is charged to have been made in a report to the Comptroller of the Currency, instead of an entry made in one of the books of the bank.

The *second* objection, that the defendants could not be convicted as principals in making the reports, but only as accessories, would probably be true, if they were charged with making such reports. And the *third* objection, that no one except he who verifies the reports can be convicted under said indictments, is unsound as matter of law, for the reason

above stated, that the penalty is affixed to the making of the false entry, and not at all to the making of the report. While the officers of the bank who verify and attest the reports are doubtless responsible for what is contained in them; if, as matter of fact, and as often happens, the entries in such reports are actually made by other agents of the association, it does not diminish the criminality of such agents in the eye of the law, that the reports are ostensibly those of the president and cashier. If the statements of Thomas be taken as true, he, although verifying the reports as cashier, could not be held criminally liable for their falsity, since he took and believed the statements of Cochran and Sayre as to the truth and correctness of such reports. If this be true, there was lacking on his part that intent to defraud the association, or to deceive the Comptroller of the Currency, which is made, by section 5209, a material element of the offence. If the persons who actually prepared the report, and made the false entries therein, cannot be held responsible, because they did not ostensibly verify or attest the reports, then, however false such reports might be, no one could be held criminally responsible. This would certainly be an easy method of making false reports, and avoiding all liability therefor. The person who in fact made the false entries would not be liable, because he did not verify the report. The person who verified the report would not be liable, because he was wholly ignorant of the truth or falsity of the entries, and innocent of any criminal intent. His ignorance of the truth of the report might not and probably would not excuse him from liability in a civil action for negligence, but he could only be held criminally for an evil intent actually existing in his mind — at least unless his ignorance were wilful, or his negligence in failing to inform himself so gross as to characterize his conduct as fraudulent.

As it was admitted that Sayre actually made the entries in and filled out the report in question, he was properly charged as principal; and it was a question for the jury to say whether Cochran, the president, so far aided and abetted him in making such entries as to make him liable as accessory.

7. A large number of other objections were made and exceptions taken to the admission of testimony, which may not arise upon another trial, and which it is unnecessary here to discuss. Certain of them, however, are based upon the character of the false entry alleged to have been made, and go to the very foundation of the prosecution. In this particular, the indictment charges the defendants with making "a certain entry under the head of 'liabilities' in said report, numbered '19,' which said entry was then and there in the words and figures following — that is to say: '19. Liabilities other than those above stated, none;' and which said entry, so as aforesaid, made in said report, then and there purported to show, and did in substance and effect indicate and declare, that said association had no other debt and liability other than those debts and liabilities named and set forth in said report, under said head of 'liabilities,' named and set forth in said report, under said head of 'liabilities,' in said report."

After setting forth the general falsity of the entry, the indictment avers "that the said entry so made, as aforesaid, was then and there false, in this, that the said association was then and there indebted and liable to the Hanover National Bank of New York city in the sum of five thousand dollars, evidenced by a certain promissory note executed by the said Robert H. Sayre and one A. H. Clark, and payment thereof guaranteed by said association to said Hanover National Bank of New York city, as he, the said Robert H. Sayre, then and there well knew."

The note was made August 21, 1892, and was payable four months after date to the First National Bank of Del Norte, and consequently was not due until December 21. The guaranty, which was endorsed upon the back, was as follows: "For value received we hereby guarantee payment of the within note at maturity, or at any time thereafter, with interest at the rate of six per cent per annum until paid, waiving demand or notice of non-payment or protest. W. H. Cochran, president."

The indictment, therefore, raises the question whether an unmatured note, the payment of which at maturity is guaranteed

by the bank, is such a liability as is required by law to be shown in the report to the Comptroller of the Currency. The fact that the note had not matured cuts no figure in the case   If the bank had *made* the note, it would not be claimed that the note was not a liability, though it were not yet due.   The real question is, whether the fact that the bank was only contingently liable prevented its character as a "liability" of the bank from attaching.

We know of no definition of the word "liability" either given in the dictionaries or as used in the common speech of men, which restricts it to such as are absolute, or excludes the idea of contingency.   In fact, it is more frequently used in the latter sense than in the former, as when we speak of the liability of an insurer or a common carrier, or the liability to accidents or to errors; and in Webster's Dictionary the word "liable" is said to refer " to a future possible or probable happening, which may not actually occur: as horses are liable to slip; even the sagacious are liable to make mistakes."

That Congress must have contemplated contingent liabilities is evident, when we consider the object of section 5211, which was to apprise the Comptroller of the Currency and the public of the condition of each national bank at stated periods. It is manifest that a report which failed to specify the liabilities which the bank had assumed, and which it might be called upon to discharge, would represent very imperfectly the actual financial status of the association.   While it is true that the bank could not be made chargeable with the payment of the note until its maturity, the guaranty in this case was not that the makers were solvent, or that the bank should pay in case they could not be compelled to do so, but was a guaranty of the *payment* of the note at maturity — such a guaranty in fact as, within the recognized principles of law, would authorize the holder to proceed immediately against the guarantor, without exhausting his remedy against the makers.   *City of Memphis* v. *Brown*, 20 Wall. 289, 310; *Arents* v. *Commonwealth*, 18 Grattan, 750 ; *Campbell* v. *Baker*, 46 Penn. St. 243, 245 ; *Roberts* v. *Riddle*, 79 Penn. St. 468; *Douglass* v. *Reynolds*, 7 Pet. 113, 126.

We have held that a contract of guaranty is within the implied powers of a national bank. *People's Bank* v. *National Bank*, 101 U. S. 181.＊ And in this case there seems to have been good ground for believing that the note actually belonged to the bank, as Cochran, president of the bank, in his letter of December 14, 1891, transmitting the original note to the cashier of the New York bank, says : "We enclose a note of five thousand dollars, signed by Sayre and Clark, guaranteed by us, which please *place to our credit.*" It appears, too, by the testimony of the cashier of this bank, that the note was discounted by the cashier of the Hanover National Bank, December 21, 1891, for account of the First National Bank of Del Norte, which was the original transaction for the same amount executed by the same parties.

8. Several of the instructions to the jury relate to the questions whether the note given by Sayre and Clark was immediately discounted by the Del Norte Bank and the amount paid to Sayre, in which case the court charged that it was a loan to Sayre and that the note should have appeared in the report among the notes and bills rediscounted ; or whether it was a sale of the note to the Hanover National Bank upon the credit of Sayre and Clark and the Del Norte Bank, in which case the court charged that all parties would be liable as makers, and the note should have appeared in the report under the head of bills payable. We fail to see how the defendant was prejudiced by these instructions. The material question was, not under what particular head the note should have appeared, but whether it should not have appeared somewhere in the report as a liability. In that view the court charged : "The pleader in setting it forth seems to have been in doubt as to whether it should be called one thing or another, and so he assumed that it was one which should have been mentioned under the head of liabilities other than those above stated ; and I think he could reasonably do so, and that he may charge that the entry was not true, as he has done." Of course, the defendant in this connection could show that the entry was made under some other head, but no attempt appears to have been made to do so.

9. The thirtieth assignment is to an alleged error of the court in refusing to instruct the jury as follows: " You are instructed that a false entry in a report of a national bank officer or director to the Comptroller of the Currency, within the meaning of the Revised Statutes, section 5209, is not merely an incorrect entry made through inadvertence, negligence, or mistake, but is an entry known to the maker to be untrue and incorrect, and intentionally entered, while so knowing its false and untrue character. The intention to deceive is essential to constitute a violation of the statute, and you must be satisfied beyond a reasonable doubt from the evidence, first, that the defendants or one of them made a false entry in said report; and second, that it was made with the intention of misleading or deceiving the Comptroller of the Currency, or some other person or persons alleged in the said indictment."

The court in this connection charged : " There is no doubt that intent to injure and defraud must exist in order to make the party liable under this statute — that is to say, if the omission was ignorantly made, if it was made merely out of stupidity and because the parties did not understand what was required of them, there is no offence under the statute. The statute relates to intentional wrongdoing. The intent must have been, as laid in the indictment, to mislead and deceive one of these parties, either some of the officers of the bank or the officer of the government appointed to examine into the affairs of the bank. . . . So that you must find, not only the fact that there was an omission to make the proper entry but that it was with an intent to conceal the fact from somebody who was concerned in the bank, or concerned in overseeing it, and supervising its operations and the conduct of its business."

We think this charge practically covers everything contained in the instruction refused. Certainly the jury could not have convicted if they had found that the entry had been omitted through any inadvertence or negligence, or in ignorance of its untrue character.

10. The thirty-sixth assignment is to an error of the court in refusing to give the following instructions : " You are further instructed that the defendants are presumed to be

innocent until the contrary appears beyond a reasonable doubt, and that every reasonable doubt or presumption arising from the evidence must be construed in their favor." In the recent case of *Coffin* v. *United States*, 156 U. S. 432, one of the instructions asked and refused was as follows: "The law presumes that persons charged with crime are innocent until they are proven by competent evidence to be guilty. To the benefit of this presumption the defendants are all entitled, and this presumption stands as their sufficient protection unless it has been removed by evidence proving their guilt beyond a reasonable doubt." The court instructed the jury as follows: "Before you can find any one of the defendants guilty, you must be satisfied of his guilt as charged in some of the counts of the indictment beyond a reasonable doubt." And again: "You may find the defendants guilty on all the counts of the indictments if you are satisfied that beyond a reasonable doubt the evidence justifies it." In other words, while the court refused to instruct as to the presumption of innocence, it did instruct fully as to reasonable doubt, and the contention was that, as the charge given by the court on the subject of reasonable doubt substantially embodied the statement of the presumption of innocence, the court was justified in refusing in terms to grant the latter. It was held that the charge that there could not be a conviction unless the proofs showed guilt beyond a reasonable doubt did not so completely embody the statement of the presumption of innocence as to justify the court in refusing, when requested, to inform the jury concerning the latter. The court drew a distinction between the presumption of innocence as one of the instruments of proof, contributing to bring about that state of case, from which reasonable doubt arises, and a condition of mind called reasonable doubt produced by the evidence.

In the case under consideration the court charged the jury that "these matters are to be established in your minds beyond reasonable doubt, and upon that subject as to what is a reasonable doubt, which should be heeded by the jury in a trial of this kind, I read an instruction prepared by defendants' counsel." There follows here a carefully prepared

definition of the words "reasonable doubt," but there is nothing in this request, as given by the court, which refers to the presumption of innocence, which attends the accused at every stage of the proceeding; and we think the defendants were entitled to an instruction upon that point, if requested. It is frequently assumed by courts that an instruction to a jury that they must not convict unless satisfied of the defendant's guilt, beyond a reasonable doubt, carries with it an implication that the presumption of innocence has been overborne by satisfactory evidence of guilt. This, as stated in the *Coffin case,* is the tenor of some of the authorities upon the subject; but in that case they were distinguished, and a presumption of innocence said to be "a conclusion drawn by the law in favor of the citizen, by virtue whereof, when brought to trial upon a criminal charge, he must be acquitted, unless he is proven to be guilty;" while reasonable doubt is defined as a "condition of mind produced by the proof resulting from the evidence in the cause." "To say that the one is the equivalent of the other is, therefore, to say that legal evidence can be excluded from the jury, and such exclusion can be cured by instructing them correctly in regard to the method by which they are required to reach their conclusion upon the proof actually before them." We held that this could not be done — in other words, that the exclusion of an important element of truth could not be justified by correctly instructing as to the proof admitted. In the case under consideration, counsel asked for a specific instruction upon the defendants' presumption of innocence, and we think it should have been given.

The *Coffin case* is conclusive in this particular, and it results that the judgment of the court below must be

*Reversed, and the case remanded with instructions to grant a new trial.*