# IN RE LOCKHART.

(No. 5,671.)

(Submitted December 11, 1924. Decided December 27, 1924.)

[232 Pac. 183.]

*Criminal Law—Habeas Corpus—Banks and Banking—Making False Reports—Indictment and Information—Sufficiency.*

*Habeas Corpus*—Function of Writ.
1. The writ of *habeas corpus* is not supervisory in character and does not perform the function of an appeal, its only office being to present the inquiry whether the court below had jurisdiction over the person of the complainant and of the subject matter, and authority to render the judgment attacked.

[72 Mont. 136.]

Same—Indictment or Information—Sufficiency—Extent of Review.

2. The sufficiency of an indictment or information may be questioned on *habeas corpus* for the purpose of impeaching the judgment of conviction, but in such case every intendment will be resolved in favor of its sufficiency, *i. e.*, the supreme court will go no further than to inquire whether, upon any admissible theory, the pleading states a public offense, however informal the charge may be.

Same—Banks and Banking—False Report by Director—Indictment—Sufficiency.

3. *Held*, that the "making" of a report by a state bank to the superintendent of banks as required by section 6071, Revised Codes, comprehends any and all of the acts therein mentioned necessary to effectuate the purpose of the requirement; that the attestation by a director is essential to the completion thereof, and to that extent imposes upon him the duty of making the report, that by attesting the report he vouches for the absolute truthfulness of the statements contained therein, and that an indictment charging him with a violation of the statute in so making a false report states a public offense.

Statutory Construction—Words and Phrases—How Meaning Determined.

4. Where a word has many significations, the particular meaning to be imputed to it in any given instance must be determined from the context and the general purpose of the provision of the statute in which it is found.

Same.

5. A bank was called upon by the superintendent of banks to make report of its condition at the close of business on June 30 of a certain year. The report was made a month and a half later. The indictment charging a director with the false making of the report alleged that the report was that the bank did not owe anything for borrowed money, whereas it "had borrowed" a large sum of money from another bank. *Held*, under the rule that after conviction the supreme court on application for writ of *habeas corpus* will uphold the judgment if upon any possible theory the indictment or information states a public offense, that the pleading was sufficient, and that the assertion that it was insufficient because it did not allege that the money had not been repaid when the report was made is without merit, the fact of its repayment then being immaterial if the statement was false on June 30, and that the phrase "had borrowed" was fairly susceptible of the interpretation that the act of borrowing was complete immediately before the close of business on June 30 and sufficient to negative the idea that the borrowed money had been repaid.

APPLICATION for writ of *habeas corpus* by L. B. Lockhart directed to the sheriff of Cascade County. Writ discharged and prisoner remanded to custody.

2. *Habeas corpus* as remedy to test sufficiency of indictment, or information, see notes in 11 Ann. Cas. 1054; L. R. A. 1918B, 1156.

*Mr. W. F. O'Leary,* for Complainant, submitted a brief and argued the cause orally.

*Mr. L. A. Foot,* Attorney General, and *Mr. I. W. Choate,* Assistant Attorney General, for the State, submitted a brief; *Mr. Choate* argued the cause orally.

MR. JUSTICE HOLLOWAY delivered the opinion of the court.

L. B. Lockhart, having been convicted of the crime of making a false report to the state superintendent of banks, applied to this court for his release on *habeas corpus.* The sheriff of Cascade county, to whom the writ was directed, made return that he holds the prisoner in his custody by virtue of a judgment of the district court sentencing him to a term of imprisonment, and a commitment from the court directing the delivery of the prisoner to the warden of the penitentiary. A copy of the indictment upon which the trial was had, a copy of the judgment, and a copy of the commitment are attached to and made a part of the return.

The writ of *habeas corpus* is not supervisory in character, nor [1] may it be made to perform the function of an appeal (*In re Jones,* 46 Mont. 122, 126 Pac. 929); its only office here is to present the inquiry whether the court *a quo* had jurisdiction (*In re Gomez,* 52 Mont. 189, 156 Pac. 1078), for if jurisdiction were wanting, the judgment is void (*In re Schaffer,* 70 Mont. 609, 227 Pac. 37). The preponderant authority now sanctions the rule that in order for a judgment to be proof against an attack by *habeas corpus,* the court which rendered it must have had jurisdiction of the person and of the subject matter, and, in addition thereto, must have had authority to render the particular judgment which it did pronounce. The absence of any one of these factors renders the judgment open to collateral attack (*In re Mettler,* 50 Mont. 299, 146 Pac. 747).

It cannot be questioned here, that the court below had jurisdiction of the person of Lockhart (*Haupt* v. *Simington*, 27 Mont. 480, 94 Am. St. Rep. 839, 71 Pac. 672) and jurisdiction to try him for the particular offense (sec. 11, Art. VIII, Constitution of Montana) if he.were before the court charged with that offense.

While there is some diversity of opinion upon the question [2] whether the sufficiency of the indictment or information may be questioned on *habeas corpus* after conviction to impeach the judgment, we are of the opinion that it may be done; for the jurisdiction of the district court in criminal matters extends only to acts which the law declares to be criminal, and if in this instance, the prisoner is restrained of his liberty for the commission of an act or acts to which the law does not attach criminality, the court acted beyond its jurisdiction in passing judgment upon him and he is entitled to his release. But where the indictment or information is attacked for the first time after judgment, every intendment will be resolved· in favor of its sufficiency, or, in other words, this court on *habeas corpus* will not go further than to inquire whether, upon any admissible theory, the indictment or information states a public offense, however, informal the charge may be.

In the indictment before us the state charges that during [3] May, June and July, 1921, the Miners' State Bank of Sand Coulee was a domestic corporation engaged in banking business in Cascade county, and that at all such times Lockhart was a director of that bank; that in July, 1921, the state superintendent of banks called upon the Miners' State Bank of Sand Coulee to report fully its condition at the close of business on June 30, 1921; that, in response thereto, Lockhart and Sprengeler, the cashier, on July 14, 1921, made a report to the superintendent, which report was verified by Sprengeler and attested by Lockhart, and forwarded to the superintendent and by him received some time during the month of July, 1921. It is charged further that the report contained

a material statement which was false and known to be false by Lockhart and Sprengeler.

1. It will be observed that it is charged that, in making the report, Lockhart acted in his capacity as a director of the bank, and it is urged, first, that he could not be "guilty of the offense charged in the indictment because a director, as such, has no right or authority to make any report to the state superintendent of banks." While it is true that the affairs of a bank are managed by a board of directors (sec. 6025, Rev. Codes), and that this contemplates concerted action as distinguished from the action of the individuals constituting the board, nevertheless, if the legislature has seen fit to impose special duties upon the individual director, he cannot escape responsibility therefor merely because the board, as an entity, has the general management of the affairs of the bank. The question arises, then: Has the legislature imposed any duty upon the individual director with respect to the reports which his bank is or may be required to make to the superintendent of banks?

So far as this alleged offense is concerned, the governing statutes are found in sections 6014–6109, Revised Codes of 1921; the amendments made in 1923 are disregarded. So much of section 6071 as is material to this inquiry, reads as follows: "Every bank shall make to the superintendent of banks not less than five reports during each year, according to the form which may be prescribed by him, verified by the oath or affirmation of the president, vice president, or cashier of such bank, and attested by the signatures of at least two of the directors." These may be designated the regular reports.

Section 6073 provides that the superintendent may also require from a bank a special report, verified as required by section 6071, "whenever in his judgment such special report is necessary to inform him fully of the actual financial condition and affairs of such bank."

It does not appear directly whether the report upon which this indictment is laid was a general or a special report. From the fact that it was attested by only one director (Lockhart) counsel for the prisoner concludes that it must have been a special report; but the conclusion is hardly justified, since section 6073 does not, in terms at least, require a special report to be attested at all. Upon this hearing, and in the absence of any showing to the contrary, we will assume that in attesting the report the director did just what he was required to do, and the fact that another director did not join in the attestation does not affect the situation at all. (*State* v. *Struble,* 19 S. D. 646, 104 N. W. 465; *Cochran* v. *United States,* 157 U. S. 286, 39 L. Ed. 704, 15 Sup. Ct. Rep. 628 [see, also, Rose's U. S. Notes].)

The immediate question, then, is: Does section 6071 impose upon a director the duty of making these regular reports? It goes without saying that when the statute requires the bank to make the report it contemplates that it shall act through its duly constituted representatives, since a corporation cannot act otherwise. The report must be verified by the president, vice-president or cashier, and attested by the signatures of at least two directors. It is the making of the false report which is condemned by the law, and it is for that act that the penalty is prescribed by section 6077. That section reads: "Every person authorized by the provisions of this Act to make statements or reports, who willfully and knowingly subscribes or makes any false statement or report, shall be deemed guilty of a felony," *etc.* The word "make" has many significations, among others, "to produce; to execute with the requisite formalities; to put forth, give out, deliver; to inform, apprise." (Century and Webster's Internat. Dictionaries.) [4] The particular meaning to be imputed to it in any given instance must be determined from the context and the general purpose of the provision in which it is found.

Section 6071 requires that every bank "shall make to the superintendent of banks not less than five reports during each

year," and section 6073 declares that the purpose of the reports is "to inform him fully of the actual financial condition and affairs of such bank." In view of these statutory declarations it becomes apparent at once that to make such report does not comprehend merely the manual labor of writing it or affixing the required signatures to it, or making the verification or attestation, but does comprehend any and all of these acts and any other acts necessary to effectuate the purpose, including the transmission of the document. (*State* v. *Cassill*, 70 Mont. 433, 227 Pac. 49; *State* v. *Cutts*, 24 Idaho, 329, 133 Pac. 115; *State* v. *O'Neil*, 24 Idaho, 582, 135 Pac. 60.) The statute makes no distinction, therefore it must be assumed that the legislature deemed the attestation by the director just as essential to the completion of the report as the signature or · verification of the president, vice-president or cashier, as the case may be.

Counsel for the prisoner, however, insists that by his attestation the director does not vouch for the truth of the report, but only bears witness that the officer who signs and verifies it is such officer, and, in support of this contention, urges that a director is not in a position to know, and is not presumed to know, the details of the bank's business.

Section 6025, Revised Codes, provides that "every director shall take and subscribe an oath that he will diligently and honestly perform his duty in such office." Substantially the same oath is required of a director of a national bank (sec. 5147, U. S. Rev. Stats. [Comp. Stats., sec. 9685]), and, in speaking of the actual duties which that oath imposes, as distinguished from the somewhat fanciful notion of those duties sometimes entertained, it has been well said: "The idea which seems to prevail in some quarters, that a director is chosen because he is a man of good standing and character, and on that account will give reputation to the bank, and that his only office is to delegate to some other person the management of its affairs, and rest on that until his suspicion is aroused, which generally does not happen until the mischief is done,

cannot be accepted as sound. It is sometimes suggested, in effect, that, if larger responsibilities are devolved upon directors, few men would be willing to risk their character and means by taking such an office; but Congress had some substantial purpose when, in addition to the provisions for executive officers, it further provided for a board of directors to manage the bank and administer its affairs. The stockholders might elect a cashier and a president as well. The banks themselves are prone to state and hold out to the public who compose their board of directors. The idea is not to be tolerated that they serve as merely gilded ornaments of the institution, to enhance its attractiveness, or that their reputations should be used as a lure to customers. What the public suppose, and have the right to suppose, is that those men have been selected by reason of their high character for integrity, their sound judgment, and their capacity for conducting the affairs of the bank safely and securely. The public act on this presumption, and trust their property with the bank in the confidence that the directors will discharge a substantial duty. How long would any national bank have the confidence of depositors or other creditors if it were given out that these directors whose names so often stand at the head of its business cards and advertisements, and who are always used as makeweights in its solicitations for business, would only select a cashier, and surrender the management to him? It is safe to say such an institution would be shunned and could not endure. It is inconsistent with the purpose and policy of the Banking Act that its vital interests should be committed to one man, without oversight and control." (*Gibbons* v. *Anderson* (C. C.), 80 Fed. 345.)

In *Martin* v. *Webb,* 110 U. S. 7, 28 L. Ed. 49, 3 Sup. Ct. Rep. 428 [see, also, Rose's U. S. Notes], it is said: "Directors cannot, in justice to those who deal with the bank, shut their eyes to what is going on around them. It is their duty to use ordinary diligence in ascertaining the condition of its

business, and to exercise reasonable control and supervision of its officers. They have something more to do than, from time to time, to elect the officers of the bank, and to make declarations of dividends.''

Our statute does not purport to set a premium on stupidity. If a director may shield himself behind the plea that he is negligently ignorant of the business of his bank, then the grosser his ignorance, the greater his security from liability. This is not the theory upon which the law proceeds. His attestation is necessary to complete a report, and ''attest'' means ''to bear witness to; to certify; to affirm to be true or genuine.'' (Webster's Internat. Dictionary.) In defining ''attest'' Black's Law Dictionary says: ''It is also the technical word by which in the practice in many of the states a certifying officer gives assurance of the genuineness and correctness of a copy.''

It is our opinion that in requiring a director to attest a report, the law contemplates that he shall use reasonable diligence to know whether the report is true or false, and it cannot be gainsaid that the means of information are open to him. (*Harkness* v. *Guthrie*, 27 Utah, 248, 107 Am. St. Rep. 664, 1 Ann. Cas. 129, 75 Pac. 624; affirmed, 199 U. S. 148, 4 Ann. Cas. 433, 50 L. Ed. 130, 26 Sup. Ct. Rep. 4 [see, also, Rose's U. S. Notes] ; *Tuttle* v. *Iron National Bank*, 170 N. Y. 9, 62 N. E. 761.) Therefore, in attesting the report in question, Lockhart vouched for and certified to the absolute truthfulness of the statements contained therein (*Gerner* v. *Mosher*, 58 Neb. 135, 46 L. R. A. 244, 78 N. W. 384), and to that extent, at least, made the report, within the meaning of our statute.

The statute recognizes the fact that a director or officer of a bank is not infallible, and that either or both may make mistakes, and therefore it does not condemn a false report merely because it is false. The representative of the bank is

[72 Mont. 136.]

called to account and condemned as a felon only when he willfully and knowingly makes a false report.

2. In the charging part of the indictment it is alleged that [5] the report in question contained the statement that at the close of business on June 30, 1921, the bank did not owe anything for borrowed money, whereas "in truth and in fact at the close of business on June 30, A. D. 1921, the Miners' State Bank of Sand Coulee had borrowed from the Midland National Bank of Minneapolis the sum of $10,000." And it is further alleged that the statement that the bank owed nothing for borrowed money was false and known by Lockhart to be false, and was made for the purpose, and with the felonious and fraudulent intent, to deceive the superintendent of banks. This portion of the indictment is attacked upon the ground that it does not allege directly that the Sand Coulee bank was indebted to the Minneapolis bank, or that the $10,000 constituted a valid and subsisting obligation of the Sand Coulee bank, or that the money, if borrowed, had not been repaid at the time the report was made. It would not make any difference if the borrowed money had been repaid at the time the report was made, July 14, 1921. The call was for a true statement of the condition of the bank at the close of business June 30, and the truth or falsity of the report could not be affected by anything which transpired after that date.

Section 11852 provides that the charging part of an indictment or information is sufficient if "the act or omission charged as the offense is clearly and distinctly set forth in ordinary and concise language, without repetition, and in such manner as to enable a person of common understanding to know what is intended."

Section 11853 provides: "No indictment or information is insufficient, nor can the trial, judgment, or other proceedings thereon be affected by reason of any defect or imperfection in matter of form which does not tend to the prejudice of a substantial right of the defendant upon its merits."

These are the statutory rules which are to guide the trial court in passing upon a demurrer interposed under section 11898, but, upon an application for lease from custody on *habeas corpus* after conviction, this court is not restricted by those rules. If upon any possible theory the indictment states a public offense which will support the judgment before us, the application must be denied. The language employed in the indictment is not well chosen, and the gist of the offense might have been described in more appropriate terms. If to the portion quoted above, the draftsman had added "no part of which has been paid," the sufficiency of the indictment could not be questioned, and we are unwilling to concede that the omission of those words, or their equivalent, renders the judgment herein open to collateral attack.

In the language quoted, the indictment speaks in the past perfect tense, which signifies that the act was completed or perfected at some definite time in the past. In the connection in which it is used, the verb phrase "had borrowed" means that the act of borrowing the $10,000 had been completed at the time the bank's business closed on June 30. We are of the opinion that the man-in-the-street, of common understanding, might reasonably interpret the language to mean that the act of borrowing had been complete immediately before the close of business on June 30, and this interpretation would not do violence to the language employed, but would fairly negative the idea that the borrowed money may have been repaid.

We repeat, that upon an application for release from custody on *habeas corpus* after conviction, this court will indulge every legitimate presumption in favor of the sufficiency of the indictment, and since we are not convinced that the indictment before us fails entirely to charge a public offense, and it does appear that the prisoner is held in custody by virtue of the final judgment of a competent court of criminal jurisdiction and a commitment regularly issued upon such judg-

ment, the writ is discharged and the prisoner is remanded to the custody of the sheriff of Cascade county.

*Writ discharged.*

MR. CHIEF JUSTICE CALLAWAY, ASSOCIATE JUSTICE STARK, HONORABLE WM. H. POORMAN, District Judge, sitting in place of MR. JUSTICE RANKIN, disqualified, and HONORABLE JOSEPH R. JACKSON, District Judge, sitting in place of MR. JUSTICE GALEN, absent on account of illness, concur.