STATE, RESPONDENT, *v.* ARNOT, APPELLANT.

(No. 6,105.)

(Submitted April 22, 1927. Decided June 11, 1927.)

[256 Pac. 1082.]

*Criminal Law—Banks and Banking—False Report to Superintendent of Banks—Intent—Evidence—Insufficiency.*

Criminal Law—Banks and Banking—Officer Making False Report of Bank's Condition—Criminal Intent—Evidence—Insufficiency.
   1.  Evidence in a prosecution against the vice-president of a state bank for knowingly subscribing a false report of its condition, brought under section 6077, Revised Codes of 1921, *held* insufficient, it not showing that defendant, a nonresident of the town in which the bank was located but who kept in constant touch with its affairs, examined its books frequently and received daily statements of its condition, had knowledge of the falsity of the report when he signed it, as prepared by another officer of the bank in whom he had confidence, which report correctly set forth what appeared in the books but was rendered false by a transaction of the bank of which he was ignorant.

Same—Duty of Officer of Bank Making Report to Superintendent of Bank to Keep Himself Informed of Bank's Condition—Reasonable Diligence Required.
   2.  While a bank officer signing a report of its condition intended for transmission to the superintendent of banks cannot, in case of its falsity, shield himself behind negligent ignorance, he cannot be held criminally responsible for an honest mistake; if he uses reasonable diligence to keep himself informed of the affairs of his bank and to know whether the report is true or false, or his ignorance is not wilful or his negligence in failing to inform himself so gross as to characterize his conduct as fraudulent, a criminal charge under section 6077, Revised Codes of 1921, which makes intent an essential element of the offense therein condemned, cannot be sustained.

   [1]   Banks and Banking, 7 C. J., sec. 194, p. 574, n. 77, p. 575, n. 78, p. 576, n. 83.   Exhibit, 25 C. J., p. 167, n. 34 New.   Criminal Law, 16 C. J., sec. 1590, p. 778, n. 96.
   [2]   Banks and Banking, 7 C. J., sec. 194, p. 576, n. 83.

*Appeal from District Court, Valley County; C. D. Borton, Judge.*

J. E. ARNOT was convicted of making a false report to the State Superintendent of Banks of the condition of a state

1.   See 3 R. C. L. 503.

bank, and appeals from the judgment and the order refusing him a new trial. Reversed and remanded, with direction to dismiss the indictment.

*Messrs. Tressler & Kirton* and *Messrs. Hurd, Rhoades & Hallett,* for Appellant, submitted a brief; *Mr. George E. Hurd* argued the cause orally.

*Mr. L. A. Foot,* Attorney General, and *Mr. A. H. Angstman,* Assistant Attorney General, for the State, submitted a brief; *Mr. Angstman* argued the cause orally.

MR. JUSTICE MYERS delivered the opinion of the court.

This is a companion case to No. 6,096, *State* v. *Asal, ante,* p. 385, and is an action for the alleged offense of making to the state superintendent of banks a false report of the condition of a state bank.

The State Bank of Nashua, in Valley county, was a banking corporation, incorporated under the laws of Montana. Defendant was a director and the president of the bank. He lived at Glasgow, some sixteen miles away, where he personally conducted another bank. E. P. Asal, the defendant in the case of *State* v. *Asal,* supra, was a director and the cashier of the State Bank of Nashua and was on the ground and personally in charge of the conduct thereof. A. M. Sheldon, a director and the vice-president of the State Bank of Nashua, lived at Minneapolis, Minnesota, where he conducted a business institution known as Sheldon Brothers Company, designated as bankers and investors. It was incorporated and, as shown by the record in this case, did some banking business; received deposits, kept checking accounts, issued drafts and the like.

January 3, 1924, the superintendent of banks issued and sent to the cashier of the State Bank of Nashua a call for a report, to show the condition of the bank, at the close of business, December 31, 1923, and to be made on a blank form furnished by the superintendent. In response, a report of the

condition of the bank, at the close of business on December 31, 1923, was made and sent to the superintendent.

The report was subscribed and sworn to by the cashier and was signed, in attestation, by defendant and Sheldon, as directors. The report contained the statement that at the close of business, December 31, 1923, there was due from the First National Bank of Minneapolis, a banking corporation at Minneapolis, Minnesota, and an approved reserve agent, to the State Bank of Nashua the sum of $4,196.03. Later, a grand jury indicted jointly this defendant, Asal and Sheldon upon the charge of making a false report of the condition of the bank. The indictment, in addition to alleging the foundational facts, as well as the issuance of the call and the making of the report and the statement in the report of the alleged indebtedness, in the sum of $4,196.03, of the First National Bank of Minneapolis to the State Bank of Nashua, alleged that such statement was false and that at the close of business, December 31, 1923, there was not due from the First National Bank of Minneapolis to the State Bank of Nashua the sum of $4,196.03, or any other sum but that, at that time, the account of the State Bank of Nashua with the First National Bank of Minneapolis was overdrawn in the sum of $971.79 and that such false statement in the report of the State Bank of Nashua was made wilfully, wrongfully, unlawfully, knowingly and feloniously, with intent to deceive the superintendent of banks and his duly authorized agents and any and all other persons duly authorized to examine the reporting bank.

The defendant had a separate trial. He was found guilty and judgment was pronounced. He moved for a new trial. The motion was denied. Defendant appealed from the judgment and from the order denying his motion for a new trial and he assigns a large number of specifications of error.

The indictment is based upon that part of section 6077, Rev. Codes of 1921, which provides that "every officer, agent or clerk of any bank who * * * knowingly subscribes or exhibits false papers, with the intent to deceive any person

authorized to examine such bank  *  *  *  shall be deemed guilty of a felony."

Counsel for defendant contend the indictment is fatally defective and by specification of error challenge its sufficiency. It is the same indictment upon which Asal, the cashier, was prosecuted in the case of *State* v. *Asal,* supra, and, for the reasons given in the opinion delivered in that case, we hold the indictment sufficient.

Counsel for defendant assign as error the insufficiency of [1] the evidence to support the verdict or the judgment. That contention was made in the court below by motion for directed verdict and again by motion for new trial, both of which were overruled. We take up now, for consideration, that assignment.

The inhibition of the statute under which defendant was prosecuted is a double, disjunctive one, i. e., knowingly subscribing or exhibiting false papers, with intent to deceive. The indictment charges defendant with doing both. If he did either, with regard to the bank report, he is guilty. Defendant admits he signed the report. The mailing of it to the superintendent was exhibiting it.  (3 Words and Phrases; Bouvier's Law Dictionary; Standard Dictionary.)  Defendant did not mail it but, if he permitted it to be done or allowed it to be done with his tacit or express approval or consent, he participated in the exhibiting of it.

It is plain that, in respect to the item alleged by the indictment to be false, the report was incorrect. The report contained the statement that at the close of business, December 31, 1923, there was due from the First National Bank of Minneapolis to the State Bank of Nashua the sum of $4,196.03. That statement was not true. Giving the Nashua bank credit for remittances made directly to the Minneapolis bank, December 31, 1923, and theretofore, which on that date had not reached the latter bank and charging the former with drafts drawn on the Minneapolis bank and which were in transit or in circulation, we hold that, in the eyes of the law, on December 31,

1923, at the close of business, the Nashua bank had in the Minneapolis bank a credit of $1,196.03 and no more; the indictment charges there was an overdraft but we think not. Therefore, defendant signed an untrue report; but falsity is not all that is required. The trial court instructed the jury that, to justify conviction, it had to be proven, beyond reasonable doubt, not only that the report was false in the particular specified but that defendant knew it to be false, when he made it, and that he made it wilfully and knowingly, with intent to deceive the superintendent of banks. In that, the court was correct. (*State* v. *Dahlgren,* 74 Mont. 217, 239 Pac. 775.) The act of signing the report was an essential part of making it.

The call for the report was received at the Nashua bank, January 4, 1924; Mr. Wick, the assistant cashier, prepared the report, that day, and on the same day it was subscribed and sworn to by the cashier. That day, the cashier mailed it to defendant at Glasgow, for his signature, with directions, when he had signed it, to send it to Sheldon, at Minneapolis, for the latter's signature, and with further directions (written and enclosed by Asal, the cashier) to Sheldon that, when he had signed the report, he return it to the Nashua bank.

December 22, 1923, Asal, as cashier, issued two certificates of deposit of $5,000 each, both payable to the order of Sheldon Brothers Company. December 24, he sent them to Sheldon Brothers Company, with a letter, directing that the amount thereof be placed to the credit of the Nashua bank in the First National Bank of Minneapolis. The same day there was entered in the books of the Nashua bank a charge of $10,000 against the Minneapolis bank. The evidence shows that was a common thing to do. The Minneapolis bank was the twin-cities correspondent of the Nashua bank. There the latter kept a continual, active, fluctuating account. Almost daily, it made cash remittances directly to its correspondent and drew drafts upon it. Frequently, the Nashua bank sent to Sheldon Brothers Company certificates or other evidence of indebted-

ness, security, collateral, with directions to deposit the same in the Minneapolis bank to the credit of the Nashua bank, depending on A. M. Sheldon, vice-president of the latter, to do so. It was testified that he had always done so and not, in one instance, had he failed or had the Nashua bank been disappointed. Remittances made to the Minneapolis bank and certificates or other evidence of indebtedness, as the basis of credit, sent to Sheldon Brothers Company, for deposit in the Minneapolis bank, were always charged to the latter on the day of mailing the same. There was testimony that it was and long had been the custom so to do and that it was in accordance with banking custom and was known to the superintendent of banks.

The assistant cashier of the Nashua Bank supposed for some days, he testified, that the whole of the sum of $10,000 represented by the two certificates of deposit had been put to the credit of the Nashua bank, as directed. Shortly before Wick, the assistant cashier, made up the report, he had information, or, at least, understood, he testified, that only $3,000 of the proceeds of the certificates had been deposited in the Minneapolis bank to the credit of the Nashua bank and that the remaining $7,000 had been retained by Sheldon Brothers Company. He changed his book entries accordingly, to show $3,000 thereof in the Minneapolis bank and $7,000 thereof with Sheldon Brothers Company, to the credit of the Nashua bank. He made the report show the same condition. The $3,000 thus charged to the Minneapolis bank, in addition to the sum of $1,196.03, already charged on his books to the Minneapolis bank, made the credit of $4,196.03 claimed in that bank. The report was a true report according to the bank books. This case is based entirely upon that claim of credit in the sum of $3,000.

However, Sheldon Brothers Company did not deposit the certificates of deposit or either thereof or any part of the proceeds thereof in the Minneapolis bank—neither $3,000 nor any other sum. Instead, on January 3, A. M. Sheldon, as vice-

president of the Nashua bank, executed and delivered to the
Minneapolis bank the promissory note of the State Bank of
Nashua, in the sum of $3,000, due three months after date,
without interest. The Minneapolis bank accepted the note,
discounted it and gave the Nashua bank credit, on account
thereof, for the sum of $2,953.90. Sheldon Brothers Company
kept the certificates of deposit. The same day, January 3,
Sheldon Brothers Company wrote Asal of what Sheldon had
done and said that, on account of the note, the Minneapolis
bank had given the Nashua bank credit in the sum of $3,000,
saying nothing about the discount. The letter bearing that
information contained some cautionary admonition about over-
drawing. Thus, not until January 3 did the Nashua bank get
additional credit with the Minneapolis bank for $3,000 (less
discount) and then not on account of the certificates but by
reason of such note; while the report claimed it as of Decem-
ber 31. Therein consisted the inaccuracy of the report.

The report (subscribed and sworn to by the cashier) was
received by defendant and signed by him, January 4 or 5,
and by him then forwarded to Sheldon. Defendant never
thereafter saw it, so far as the evidence shows. The report was
signed by Sheldon and was received back at the Nashua bank
some time prior to January 23. On that day, Wick, the as-
sistant cashier, mailed it to the superintendent. While the
report was incorrect in respect to the additional credit of
$3,000 claimed with the Minneapolis bank, in order to render
defendant guilty he must have known it was false, when he
signed it, and it must have been signed with intent to deceive;
or, else, defendant must have learned of the falsity before
it was sent to the superintendent and, in that event, he must
have allowed it to be sent, with his concurrence, with intent to
deceive.

A careful reading of all of the evidence to the time the state
rested its case, when counsel for defendant moved for a directed
verdict, fails to disclose any substantial evidence, upon either
hypothesis, of guilt on the part of defendant. Nearly all

of the state's evidence was devoted to establishing the incorrectness of the report in the particular in question, of which there is not a particle of doubt; none, so far as we can see, tends to prove knowledge in defendant, before or after signing, of the incorrectness.

Wick, the late assistant cashier, testified that defendant frequently visited the bank; that, when he did so, he would check over the affairs of the bank; would inquire into the condition of the bank. He said, further, defendant was furnished daily statements of the condition of the bank. They were taken from the books of the bank.

Some minutes of the meetings of the directors of the bank and of the stockholders, all held at Nashua, were offered and received in evidence. A meeting of the directors was held, December 28, 1923. The minutes show defendant was present. That was before the report had been called for and was a week before the report was sent to defendant. There is no evidence that defendant learned anything then to impute guilt to him; no evidence that he had then any idea of making a false report.

There is no evidence that defendant was again in Nashua until January 19, 1924, when he attended the annual meeting of stockholders and, immediately thereafter, the annual meeting of directors. Whether or not the report then had been received from Sheldon is not disclosed. There is nothing to show that the report was mentioned to defendant or, in any way, brought to his attention, on that occasion.

The minutes of the meeting of stockholders recite that all affairs of the bank were carefully examined; how closely or extensively is not stated. If the books were examined then by defendant, the entries with relation to the two certificates of deposit showed that on December 31, 1923, there was, on account thereof, a credit of $3,000 with the Minneapolis bank and a credit of $7,000 with Sheldon Brothers Company, just as the report showed, when defendant signed it, the books having been made to show that condition at the time the report was prepared, according to Wick's testimony. That

would have disclosed to defendant nothing false about the report.

Certain letters from Sheldon Brothers Company were introduced in evidence. One, dated December 27, was addressed to the State Bank of Nashua. It acknowledged receipt of the two certificates of deposit for $10,000 and said "we are crediting the amount to your account." Where it was credited, whether with Sheldon Brothers Company or in the Minneapolis bank, as had been directed, is not stated. Another letter introduced in evidence was the one written January 3, and addressed to Asal, the cashier, in which he was informed of the execution and delivery to the Minneapolis bank of the note of the Nashua bank for $3,000 and credit for that amount. Both of those letters were sent to Nashua. There was no evidence, when the state rested, that defendant had ever seen either. The above mentioned note, itself, was introduced in evidence. It was marked paid April 3, 1924. Evidently, it was not in the Nashua bank when defendant was there, January 19. There is no evidence that he ever saw it or was ever told anything about it or ever knew of it.

Still another letter introduced was one dated December 21, written by Sheldon Brothers Company to defendant. It refers to the advisability of banks keeping up their reserves as much as possible. It does not mention the Nashua bank but one may infer a reference to it. Some suggestion about issuance of certificates of deposit is made. There is no suggestion of making any false report. Nothing criminal is suggested.

A carbon copy of a letter from defendant to A. M. Sheldon was introduced. It was dated December 21. It relates to the affairs of the Nashua bank but savors of nothing criminal. It does not hint at making a false report or any intention so to do. The correspondence between Sheldon or his company and defendant shows a desire to make a showing of a good-sized reserve fund but indicates no design whatever in defendant to make a false report.

A copy of a telegram purporting to be from and signed Sheldon Brothers and addressed to defendant was introduced. It was dated January 5 and said: "Advise Asal he must not overdraw." Whether or not it was properly admitted, it was admitted. We see in it nothing incriminating. It does not say where Asal should not overdraw; whether in any particular place or whether intended merely as advice not to overdraw anywhere, at any time. It was sent two days after A. M. Sheldon, as vice-president of the Nashua bank, had given the Minneapolis bank the note of the Nashua bank for $3,000 and obtained for the latter with the former a credit in substantially that amount, of which defendant knew nothing so far as disclosed. Whether or not it was intended to warn Asal not to draw on the Minneapolis bank in excess of that amount we cannot say. It was sent after the report of the Nashua bank's condition, as of December 31, had been prepared; whether before or after defendant had signed is not disclosed. We cannot see that it has any bearing on the report.

We do not see any evidence to prove that when defendant signed the report he was aware of the misstatement in it about the credit of $3,000 involved. There is nothing to show he had any knowledge of it. The daily statements that Wick sent him only reflected the condition of the bank books. If a charge was made for a credit which miscarried in the arrangement therefor, he had no way of knowing it from his daily statements. He could only tell the charge had been made.

Furthermore, we fail to see in the record any evidence that, after defendant had signed the report and before it was mailed, January 23, to the superintendent he learned of the incorrectness of it; learned that instead of the Minneapolis bank extending credit, before December 31, on account of the certificates, for either $10,000 or $3,000, no additional credit was given until January 3 and then for $3,000 (less discount) and on a note executed by Sheldon for the Nashua bank. There is no evidence that anybody told him about these things or that

he learned in any way of them. There is no evidence that he knew, before January 23, or at all, anything about Sheldon's failure to carry out instructions or Sheldon's execution of a note. We may surmise that he knew these things but a defendant should not be convicted on surmise.

We are speaking now of the evidence introduced up to the time the state rested. It must be remembered that up to that time defendant was not required to clear himself, to explain or prove anything. It devolved upon the state to prove the defendant guilty; to fasten upon him by proof beyond reasonable doubt knowledge of the falsity of the report when he signed it or knowledge gained thereafter and before it was sent to the superintendent and that, with such knowledge, he signed it or knowingly allowed it to be sent, with intent in him to deceive the superintendent. The state fell far short of it. We do not think either condition was proven beyond a reasonable doubt or by a preponderance of the evidence or was proven at all. We hold that the motion of counsel for defendant for a directed verdict, when the state rested, was a proper motion and should have been granted. (*State* v. *Gomez,* 58 Mont. 177, 190 Pac. 982.)

Defendant's motion for a directed verdict having been denied, defendant took the stand in his own behalf. He was the only witness put on by the defense, save some character witnesses, in surrebuttal, as to reputation for veracity. The state not having made out a case, we do not see that it was aided any by defendant's testimony. We do not see that it elicited from him that which it had failed to produce.

Defendant testified that he received daily statements of the condition of the bank's business; he signed the report, January 4 or 5, and forwarded it to Sheldon; he did not see it thereafter; he had the books of the bank audited twice each year; it was done in 1923; he frequently visited the Nashua bank; in the busy season of the year—September, October and November—once or twice a week; at other seasons, not quite so frequently; he was there December 28; he then looked over

the books; it had been the custom for years for Sheldon Brothers Company to handle the bank's credit arrangements with the First National Bank of Minneapolis; Sheldon Brothers Company had never failed to follow instructions in that behalf; from his daily statement he observed that the certificates-of-deposit item on the books had been increased by $10,000 and the Minneapolis bank had been charged $10,000; when he signed the report, there was nothing in his daily statement to indicate any error in the bank's books; he signed the report believing it to be true and without any intent to deceive.

He said he had had a long experience as a banker; it was the custom of bankers to charge remittances the day sent out and to enter debits and credits the day of the transactions; when he was at the Nashua bank, December 28, he saw a copy of Asal's letter of December 24, to Sheldon Brothers Company, which accompanied the certificates of deposit, but he knew nothing more about the matter; when he signed the report, he saw from it that the whole of the $10,000 represented by the certificates was not deposited with the Minneapolis bank; he saw $7,000 reported on deposit with Sheldon Brothers Company and concluded that company had retained $7,000 and deposited $3,000 with the Minneapolis bank, to make up the reported credit there of $4,196.03; he believed that to be true; some time thereabout, he was informed that was a fact; he may have learned it by phone, as he often conversed by telephone with the Nashua bank officials.

He said he supposed he received Sheldon Brothers' telegram of January 5. Nothing he said about it connected him with any intent to sign a false report. The letter of January 3, to Asal, informing Asal of the execution by Sheldon of the note for $3,000 to the Minneapolis bank and credit on account thereof, he said he never saw until presented to him in court. A notice of credit by the Minneapolis bank to the Nashua bank (presumably sent in course of business) in the sum of $3,000, less discount, on account of the note, he said he never saw until in court.

He said he had confidence in all the officials and employees of the bank; often examined their work and always found it correct. He said he was not in Nashua, after December 28, until January 19, when he attended the stockholders' and directors' meetings. He testified to more, on direct examination, but nothing that he said betrayed any intent to commit the crime charged; any knowledge of falsity when he signed the report; any knowledge gained, thereafter and before the report was mailed, of any falsity therein.

On cross-examination, nothing was elicited to show that he knew or had any cause to suspect when he signed the report that anything in it was not true; nothing was elicited to show that he learned thereafter of anything incorrect in the report. At no time was anything elicited to show that when he was in Nashua, January 19, or at any other time, before or after, did he learn of A. M. Sheldon's action in failing to carry out instructions and in diverting the $10,000 represented by the certificates of deposit from their intended destination, the Minneapolis bank, into his own bank, that of Sheldon Brothers Company, and obtaining for the Nashua bank, with the Minneapolis bank, a credit of $3,000, less discount, by means of a note. That switch in the program, apparently made without authority, was the cause of the inaccuracy in the report and was the basis of this prosecution, as well as that against Asal, the cashier. Unless defendant knew it or learned of it before the report was sent to the superintendent, he cannot be guilty. If he knew it, the record does not disclose it and we may judge him only by the record.

Nothing to which defendant testified was contradicted. The state offered nothing in rebuttal, save the testimony of five character witnesses, who testified that the reputation of defendant, in the community, for veracity, was bad. In surrebuttal, defendant produced five witnesses, who said it was good. If there were any conflict of evidence; if defendant's testimony had been contradicted in any particular; if he had contradicted anybody; we would say the testimony

of the character witnesses, for and against him, should have due consideration; but there is no conflict of evidence. Defendant is not in conflict with any other witness. If not proven guilty, defendant should not be convicted because he may be an untruthful man. Defendant's testimony, true or untrue, may be totally disregarded, eliminated, stricken from the record; and still, in our opinion, he is not proven guilty. Hence, the testimony of character witnesses does not change the result.

In the face of the facts, as we see them, in our opinion, the only contention the state can advance as being possibly in [2] its favor is the contention advanced by it that defendant, being the president of the bank, was responsible for its affairs and it was his duty to keep fully informed in regard thereto and he may not shield himself behind ignorance.

True, in *In re Lockhart*, 72 Mont. 136, 232 Pac. 186, cited by counsel for the state, this court said: "Our statute does not purport to set a premium on stupidity. If a director may shield himself behind the plea that he is negligently ignorant of the business of his bank, then the grosser his ignorance, the greater his security from liability."

Under the evidence, was defendant "negligently ignorant"? We think not. There is a marked difference between a director who pays no attention whatsoever to the business of a bank, who blindly and unquestioningly leaves the conduct of the business to officials and employees who are paid to do the work and signs a report on the dotted line and a nonresident president who does as defendant did. They are far apart.

While an officer signing a report may not shield himself behind negligent ignorance, he is not criminally responsible for an honest mistake. "The statute recognizes the fact that a director or officer of a bank is not infallible and that either or both may make mistakes and, therefore, it does not condemn a false report merely because it is false; the representative of the bank is called to account and condemned as a felon only when he wilfully and knowingly makes a false re-

port." (*In re Lockhart,* supra.) In *State* v. *Jackson,* 20 S. D. 305, 105 N. W. 742, a prosecution for making a false report, it is said: "Neither the legislature nor public justice have decreed a term in the penitentiary for the person who, in ignorance of the facts, makes an honest mistake." It is likewise held in *United States* v. *Allis,* 73 Fed. 165; *United States* v. *Graves,* 53 Fed. 634. In *Spurr* v. *United States,* 174 U. S. 728, 43 L. Ed. 1150, 19 Sup. Ct. Rep. 812 [see, also, Rose's U. S. Notes], the supreme court of the United States held that an officer of a national bank who certified a check drawn thereon, believing in good faith that the drawer had a sufficient deposit in the bank and having reasonable grounds for such belief, though in fact the drawer's account was overdrawn and an inspection of the books would have shown it, should not be convicted of wilfully certifying falsely.

Then, what degree of diligence is required of a bank officer or director who signs an incorrect report, in order that he may defend it, justly, as an honest mistake and it may not be said of him that he was negligently ignorant? There must be a distinction. There is somewhere a line of demarcation.

In *Cochrane and Sayre* v. *United States,* 157 U. S. 286, 39 L. Ed. 704, 15 Sup. Ct. Rep. 628 [see, also, Rose's U. S. Notes], the supreme court of the United States laid down this rule: "His (defendant's) ignorance of the truth of the report might not and probably would not excuse him from liability in a civil action for negligence but he could only be held criminally for an evil intent actually existing in his mind—at least unless his ignorance were wilful or his negligence in failing to inform himself so gross as to characterize his conduct as fraudulent." The rule in this state requires reasonable diligence. It is stated in *In re Lockhart,* supra, as follows: "In requiring a director to attest a report, the law contemplates that he shall use reasonable diligence to know whether the report is true or false." Defendant attested as a director. We think, unquestionably, that the record shows he used reasonable diligence

to keep informed of the affairs of the bank. We see no evidence of negligent ignorance.

We hold the evidence was insufficient to convict. Having come to that conclusion, it is unnecessary to discuss other specifications of error. The judgment is reversed and the cause is remanded, with direction to the trial court to dismiss as to this defendant.

*Reversed.*

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES STARK, MATTHEWS and GALEN concur.