RECONSTRUCTION FINANCE CORPORATION V. Z. GOSSETT, BANKING
COMMISSIONER OF TEXAS, ET AL.

No. 7302.    Decided January 12, 1938.
(111 S. W., 2d Series, 1066.)

*Andrews, Kelley, Kurth & Campbell,* of Houston, *Birkhead, Beckman, Stanard & Vance,* of San Antonio, *Turney, Burges, Culwell & Pollard,* of El Paso, and *Aldredge, Shultz & Madden,* of Dallas, for relator.

The claim of the relator on the income debenture having been duly approved and allowed by the Banking Commissioner and all depositors and other creditors of the bank having been paid

in full, such Commissioner is bound and obligated by virtue of the statutes to pay the funds remaining in his hands to the relator, as a creditor of said bank, to be applied upon relator's approved claim. Middlekauff v. State Banking Board, 111 Texas 561, 242 S. W. 442; McNeal v. City of Waco, 89 Texas 831, 33 S. W. 322; Pennington v. Bevering, 17 S. W. (2d) 772.

*William McCraw*, Attorney General, *Scott B. Gaines*, Assistant Attorney General, and *Ocie Speer*, of Austin, for respondent.

On the question of what constitutes debt or liability. Austin v. Campbell, 210 S. W. 277; Reynolds v. McMann Oil Co., 11 S. W. (2d) 778; 10 Tex. Jur. 290; 17 C. J. 1377.

MR. JUSTICE SHARP delivered the opinion of the Court.

This proceeding involves construction of a certain income debenture issued by the Guaranty Bond State Bank, of Miles, Texas, to the Reconstruction Finance Corporation.

Relator, Reconstruction Finance Corporation, seeks a writ of mandamus against respondent, Z. Gossett, in his capacity as Banking Commissioner and as statutory receiver for the Guaranty Bond State Bank, of Miles, Texas, to compel the Banking Commissioner to pay the sum of $13,253.75 to the relator, to be applied on its indebtedness evidenced by the proof of claim filed with and approved by the respondent. The record consists of relator's sworn petition and respondent's sworn answer, which disclose that the facts are undisputed, and only questions of law are presented to this Court for determination.

During the late depression the Federal Government greatly enlarged its field of activity in extending financial aid to certain business interests. The Reconstruction Finance Corporation was one of the governmental agencies created for that purpose. This form of debenture was part of the program originated by the Federal Government, through this corporation, to assist banks and avoid, if possible, the disastrous results of a widespread depression. The debenture is quite lengthy, and frequently refers to the various sections thereof, and in order to get the intention of the parties expressed in such instrument, it is necessary to set out verbatim most of the sections contained therein. As to the others, we shall merely summarize their contents.

The Guaranty Bond State Bank will be designated as Bank, Reconstruction Finance Corporation as relator, and Z. Gossett as respondent.

This debenture is dated January 23, 1934, and begins with the statement that the Bank "hereby promises to pay to Recon-

struction Finance Corporation, or registered assigns, on August 1, 1953, at the principal office of the Bank in the city of Miles, Texas, the principal amount of FIFTY THOUSAND dollars ($50,-000), and to pay to the registered holder hereof interest on said principal amount, but only in accordance with the provisions set forth below, payable semi-annually at said office on each February 1 and August 1, from the date of this debenture at the rate of five per cent per annum and no more."

Section 1 treats of the authority of the Bank to issue such $50,000.00 debenture, and to incur other indebtedness under the restrictions contained therein.

We quote from the debenture the following sections:

"2. *Current interest due only if earned.*—Until the Debentures shall become and be due and payable, whether at maturity or by declaration or call for redemption, or otherwise, no interest shall become or be due and payable upon the Debentures unless and except to the extent that, as provided in section 5 hereof, the net profits of the Bank accruing after the date of the Debentures shall suffice for such payment: *Provided, however,* That nothing herein contained shall be deemed to prevent payments of or on account of such interest from any funds of the Bank, if the Board of Directors of the Bank so determines, provided that the sum of—

"(a) The aggregate principal amount of the Debentures at the time outstanding,

"(b) The aggregate principal amount of all indebtedness of the Bank at the time outstanding, if any, subordinated to the Debentures as to payment of principal and interest, and

"(c) The then unimpaired capital, surplus, and undivided profits of the Bank exceeds $105,000 by an amount at least equal to the interest proposed to be paid.

"3. *Determination of net profits.*—The net profits (or net loss) of the Bank shall be determined for each six months' period ending on December 31 or June 30, by deducting from the gross earnings from all sources for such period—

"(a) All expenses for such period;

"(b) All interest accrued during such period except interest on the Debentures and on indebtedness, if any, subordinated to the Debentures as to payment of principal and interest;

"(c) All losses realized during such period, and such charge-offs and write-downs of assets for the period and such transfers for the period to reserves (whether from income, undivided profits, or surplus) as in each case may be reasonably necessary to make proper provision for doubtful assets, depreciation, and

unrealized losses, including all charge-offs, write-downs, and transfers to reserves requested during the period by the State authority exercising supervision over the Bank;

"(d) Provision for all taxes for such period, including taxes measured by income and taxes based on the ownership of stock in the Bank paid or payable by the Bank for the account of its shareholders, without prejudice to such right as the Bank may have to recover the same;

"(e) Such transfers for such period to surplus as may be required by law; and

"(f) The net loss, if any, determined in accordance with the provisions of this section 3, accrued since the date of the Debentures, accumulated to and existing at the beginning of such period.

"All recoveries over net-book value on assets previously charged off or written down or against which reserves have been set up, and all transfers from reserves to surplus or undivided profits (other than transfers made to reflect recoveries already treated as gross earnings), shall be considered gross earnings for the respective periods during which such recoveries or transfers are effected. Upon the request (contained in one or more instruments of substantially similar tenor) of the registered holders of at least twenty-five per cent in aggregate principal amount of the Debentures at the time outstanding, the Bank will permit the duly authorized representatives of such holders to examine all records of the Bank for the purpose of verifying the determination of the net profits (or net loss) of the Bank for any such period.

"4. *Unpaid interest to accrue.*—Interest on the Debentures shall accrue from the date thereof, so that, if and to the extent that interest on any Debenture from such date at the full rate specified above, whether or not due and payable under the provisions of section 5 hereof, shall not have been paid (interest so unpaid to any given date, accrued from day to day, being herein termed 'accrued and unpaid interest'), such accrued and unpaid interest shall in any event become and be due and payable on such Debenture (or any portion of the principal amount thereof) whenever such Debenture (or such portion) shall become or be due and payable, whether at maturity, or by declaration or call for redemption, or otherwise.

"5. *Application of net profits and payment of interest.*—As long as any of the Debentures are outstanding, the Bank on each February 1 and August 1 shall apply its net profits for the six-months' period ending on the next preceding December 31 or June 30, as the case may be, to the following purposes and in the following order of priority, and not otherwise:

"*First:* To the payment of accrued and unpaid interest on the Debentures to and including such February 1 or August 1, as the case may be;

"*Second:* To the payment into the sinking fund for the retirement of the Debentures (referred to in section 7 hereof) of a sum equal to forty per cent of the remainder, if any, of such net profits: *Provided, however,* That the aggregate sum so paid into such sinking fund in any one year need not exceed five per cent of the maximum aggregate amount of Debentures at any time outstanding, whether or not any such Debentures shall have been subsequently retired, or the aggregate amount thereof reduced in any manner whatsoever: *Provided, further, however,* That unless otherwise elected, from time to time, by the Bank, by action of its Board of Directors, it shall not be required to make such payment into the sinking fund for the retirement of Debentures except from such net profits as may accrue and be earned from and after December 31, 1935; and,

"*Third:* To such other purposes as may be determined by the Board of Directors of the Bank, subject, however, to the provisions of sections 6, 9, and 10 hereof.

"Whenever on any February 1 or August 1, as the case may be, net profits are applicable, in accordance with the foregoing provisions of this section 5, to the payment of interest on the Debentures, interest on the Debentures at the time outstanding shall thereupon become and be due and payable, ratably, in an aggregate amount equal (in order to facilitate the calculation of the interest payments due on the respective Debentures) to the largest multiple of a sum equivalent to one fourth of one per cent of the principal amount of the Debentures at the time outstanding which does not exceed the net profits applicable to the payment of such interest as aforesaid. Any fractional amount of net profits applicable to the payment of interest on the Debentures, but not becoming due and payable, by reason of the foregoing calculation, on any interest payment date, shall be carried forward and added to that portion of the net profits which is applicable to the payment of such interest on succeeding interest payment dates.

"6. *Limitations on retirement of debentures.*—No Debentures (or portions of the principal amounts thereof) shall be called for redemption or purchased by the Bank unless the sum of—

"(a) The aggregate principal amount of the Debentures at the time outstanding, including the Debentures (or portions of the principal amounts thereof) proposed to be redeemed or purchased,

"(b) The aggregate principal amount of all indebtedness of

the Bank at the time outstanding, if any, subordinated to the Debentures as to payment of principal and interest, and

"(c) The then unimpaired capital surplus, and undivided profits of the Bank, and the sinking fund provided for herein, exceeds one seventh of the amount of the average deposit liability of the Bank for the preceding twelve-month period, by an amount at least equal to the redemption or purchase price of the Debentures proposed to be redeemed or purchased, or unless such redemption or purchase shall have been approved by the State authority exercising supervision over the Bank. No Debentures (or portions of the principal amounts thereof) shall be called for redemption or purchased unless all accrued and unpaid interest to the interest payment date next preceding the date of such redemption or purchase shall have been paid on all the Debentures at the time outstanding.

"7. *Redemption by purchase.*—Subject to the provisions of section 6 hereof, whenever the balance in the sinking fund for the retirement of the Debentures shall amount to as much as $1,000 the Bank shall (unless the Board of Directors shall elect to use the entire amount of such balance in the sinking fund for the redemption of Debentures by call as provided in section 8 hereof) within ten days thereafter mail, first-class postage prepaid, to all registered holders of the Debentures at their respective addresses as shown on the Debenture transfer register maintained by the Bank, a notice specifying the balance in such fund and stating that the same is available for the purchase of Debentures (or portions of the principal amounts thereof, each such portion to be One Hundred Dollars or a multiple thereof) at the lowest prices (not in excess of principal amount plus accrued and unpaid interest thereon to the date of purchase) offered within twenty days after the date of such notice. At the expiration of such twenty days the Bank shall apply such balance to the purchase of Debentures (or portions of the principal amounts thereof), if obtainable, in accordance with the terms of such notice. Within ten days after such expiration, subject to the provisions of section 6 hereof, the Bank shall call for redemption, in the manner provided in section 8 hereof, the largest principal amount of debentures which can be redeemed from the balance in such sinking fund remaining after deducting the amount paid or to be paid for the purchase of Debentures as aforesaid, and shall set aside from such sinking fund the amount necessary to effect such redemption. Subject to the provisions of section 6 hereof, the Bank at any time and from time to time may make such lawful transfers from its surplus and/or undivided profits to the sinking fund as the Board of Directors

may determine. All Debentures (or portions of the principal amounts thereof) purchased by the Bank, whether from the sinking fund or otherwise, shall be canceled forthwith and no new Debentures or other obligations shall be issued in exchange or substitution therefor, except that, in case of the purchase of a portion of the principal amount of a Debenture, a new Debenture for a principal amount equal to the unpurchased principal amount shall be issued without charge.

"8. *Redemption by call.*—Subject to the provisions of section 6 hereof, the bank may at any time, at its election as expressed by resolution of its Board of Directors, redeem the outstanding Debentures as a whole, or from time to time in part, by paying therefor a redemption price equal to the principal amount of the Debentures called for redemption plus all accrued and unpaid interest thereon to the date of such redemption. If less than all of the outstanding Debentures are to be redeemed, the Debentures (or portions of principal amounts thereof, each such portion to be One Hundred Dollars or a multiple thereof) so to be redeemed shall be determined by lot by the Bank. At least thirty days' prior written notice of every such redemption, stating the redemption date and the redemption price, and the place of payment thereof, shall be mailed, first-class postage prepaid, to the registered holder of each Debenture designated for redemption, at the address of such holder as shown on the Debenture transfer register maintained by the Bank. Such notice having been so mailed, the Debentures (or portions of principal amounts thereof) so called for redemption shall become due and payable on the redemption date at the redemption price, and from and after such redemption date (unless the Bank shall default in payment of the redemption price) such Debentures (or portions of the principal amounts thereof) shall cease to bear interest and shall be deemed to be no longer outstanding for any purpose except to entitle the registered holders thereof to payment of the redemption price. Payment of such redemption price (without interest) shall be made to the registered holder of each Debenture called for redemption upon surrender, on or after the redemption date, at the place designated in such notice, of such Debenture in transferable form and, if required, properly stamped for transfer. In case of default in the payment of the redemption price of any Debenture, interest shall continue to accrue thereon as herein provided. All Debentures (or portions of the principal amounts thereof) redeemed and paid as aforesaid shall be canceled forthwith and no new Debentures or other obligations shall be issued in exchange or substitution therefor, except that in case of the redemption of a portion of the princi-

pal amount of Debenture, a new Debenture for a principal amount equal to the unredeemed principal amount shall be issued without charge.

"9. *Retirement of subordinated indebtedness and of stock.*— So long as any of the Debentures are outstanding, the Bank will not purchase or otherwise acquire or make any payment on account of the principal of any of its indebtedness which is subordinated to the Debentures as to the payment of principal and interest, and will not purchase or otherwise acquire or retire any shares of its capital stock of any class, or reduce the aggregate par value thereof, without the consent in writing of the registered holders of a majority in aggregate principal amount of the Debentures at the time outstanding.

"10. *Interest on subordinated indebtedness; dividends.*—So long as any of the Debentures are outstanding, the Bank will not—

"(a) Make any payment on account of interest on its indebtedness, if any, subordinated to the Debentures as to payment of principal and interest; or

"(b) Declare, set aside, or pay any dividend, or order or mak- any distribution, whether in cash, property, stock, or otherwise, on any shares of its capital stock of any class

unless all accumulated and unpaid interest on the Debentures to and including the next preceding February 1 or August 1, as the case may be, shall have been paid in full, and unless interest to the next succeeding February 1 or August 1, as the case may be, at the full rate specified above, shall have been set aside for payment on such date.

"11. *Subordination.*—The obligations of the Bank evidenced by the Debentures shall be junior and subordinate to all obligations of the Bank to its depositors and all other creditors (except the owners or holders of indebtedness subordinated to the Debentures as to payment of principal and interest) in that no payment of principal of or interest on any of the Debentures shall be made if, after giving effect to such payment, the aggregate fair value of all assets of the Bank would be less than the aggregate of its liabilities, excluding, however, from such liabilities the Debentures, any indebtedness subordinated as aforesaid, surplus, undivided profits, and capital stock of any class.

"12. *Liquidation.*—In case of any receivership, conservatorship, liquidation, dissolution or winding up of the Bank, whether voluntary or involuntary, all depositors and other creditors of the Bank (except the owners or holders of indebtedness subordinated to the Debentures as to payment of principal and interest) shall be entitled to be paid in full before any payment

shall be made on account of principal of or interest on the Debentures. After payment in full of all sums owing to such depositors and creditors, the registered holders of the Debentures at the time outstanding shall be entitled to be paid ratably, according to the aggregate principal amount of the Debentures held by them, respectively, from all the remaining assets of the Bank (including the proceeds of all assessments, penalties, judgments, and other charges against the holders of capital stock of the Bank of any class), until payment of the principal amount of such Debentures, plus accrued and unpaid interest thereon to the date of payment, before any payment or other distribution, whether in cash, property, or otherwise, shall be made on account of any indebtedness subordinated as aforesaid, or on account of any capital stock of the Bank of any class.

"13. *Default.*—In case one or more of the following events shall occur, namely, in case—

"(a) Default shall be made in the payment of any interest on any of the Debentures when and as the same shall become due and payable pursuant to the provisions of sections 2 and 5 hereof, or otherwise, and such default shall continue for thirty days; or

"(b) Default shall be made in the payment of the principal of any of the Debentures when and as the same shall become due and payable, at maturity, or by declaration or call for redemption, or otherwise; or

"(c) Default shall be made in the due observance or performance of any other of the covenants or agreements on the part of the Bank contained herein, and the Bank shall not remedy such default within thirty days after receipt of written notice (contained in one or more instruments of substantially similar tenor) from the registered holders of at least ten per cent in aggregate principal amount of the Debentures at the time outstanding; or

"(d) The Bank shall become insolvent, or any receiver, conservator, liquidating agent, or governmental authority shall be appointed for or take possession or charge of the bank or its business or assets, or the Bank shall make any assignment for the benefit of its creditors, or suspend payment of its obligations; or

"(e) Default shall be made in the due observance or performance of any of the covenants and agreements on the part of the Bank contained in section 14 hereof;

then and in any such case the registered holders of at least twenty-five per cent in aggregate principal amount of the Debentures at the time outstanding by written notice (contained

in one or more instruments of substantially similar tenor) to the Bank, may declare the principal of all the Debentures at the time outstanding to be forthwith due and payable and thereupon such Debentures shall immediately become and be due and payable, together with all accrued and unpaid interest thereon. In case at any time after such declaration and before the date of maturity of the Debentures, all accrued and unpaid interest upon all the Debentures, together with interest on overdue interest, so far as may be lawful, at the rate of six per cent per annum, and the reasonable costs and expenses of the holders of the Debentures incurred in enforcing or protecting their rights hereunder, shall be paid by the Bank, and all other defaults hereunder shall have been cured, then and in such case such declaration and its consequences may be rescinded and annulled by like notice to the Bank from the registered holders of at least a majority in aggregate principal amount of the Debentures at the time outstanding; but no such rescission or annulment shall extend to or affect any subsequent default or impair any right with respect thereto."

In addition to the restrictions mentioned in the preceding sections, Section 14 recites other restrictions imposed upon the Bank with respect to this debenture, and also in the conduct of its business.

Section 15 relates to the transferability of the debenture.

Section 16 relates to the denominations and exchangeability of the debentures that may be issued by the Bank.

On January 23, 1934, the Guaranty Bond State Bank, of Miles, Texas, in consideration of the sum of $50,000.00 in cash paid by the relator, issued and delivered to relator the income debenture above described.

The Bank became insolvent, and on April 23, 1936, the respondent took charge of the Bank and its assets, thereby becoming statutory receiver for such Bank. No payments of any character having been made on said debenture to the relator, and default as therein defined having occurred, relator exercised its option and declared the principal and accrued interest on the debenture due and payable.

On or about June 30, 1936, relator executed and delivered to said respondent its proof of claim against the Bank on such debenture, which claim was approved and allowed in full on July 8, 1936, by respondent, acting through his duly authorized chief clerk, as an unsecured common creditor's claim to participate in the funds of the Bank to the extent of $52,170.30, after

all depositors and other creditors, other than the holder of the debenture, had been paid in full.

On the 13th day of May, 1936, respondent levied an assessment of one hundred per cent. of the amount of issued and outstanding capital stock of the Bank. From the time the Bank was placed in the hands of the respondent he proceeded with the liquidation of the Bank, and has now paid all depositors and creditors and all other liabilities of the Bank in full, except the relator. After the payment of the depositors and creditors there now remains on hand in cash, in the possession of said respondent, the sum of $13,253.75; of which amount $7,879.79 represents the proceeds of stock assessments collected from stockholders, and $5,382.96 represents the proceeds collected from other assets of the Bank. Relator made written demand on respondent to pay said sums of money to it, to be applied on its approved claim; but respondent refused to make payment of said sums of money, or any part thereof.

Relator submits the following points of law:

(1) Does the income debenture, now owned and held by the relator, evidence a debt or liability within the meaning of such terms as used in Section 16 of Article 16 of the Constitution of the State of Texas, and Article 535 of the Revised Civil Statutes of Texas, as amended by Acts 1929, 1st Called Session, Chapter 60, Section 1?

(2) If the debenture is such a debt or liability, are the funds now held by the Banking Commissioner of Texas, derived from stockholders' assessments and assets of the Bank, subject to the payment of such debt or liability?

Counsel for respondent frankly admits that if the income debenture held by relator is considered as evidencing a debt of the failed bank, then, by virtue of the Constitution itself, the funds now held by the Banking Commissioner, derived from stockholders' assessments, are, to the extent of such debt or liability of the Bank, subject to the demand of relator.

The Guaranty Bond State Bank of Miles, Texas, was incorporated under the laws of this State. Title 16, Chapters 1 to 9, inclusive, Revised Civil Statutes of Texas, as amended, Vernon's Annotated Civil Statutes, Article 342 et seq.; Article 16, Section 16, Constitution of Texas. Since the execution of this debenture by the Bank, certain provisions of the Constitution and statutes have been changed. An amendment to Section 16 of Article 16 of the Constitution was adopted on August 23, 1937. The Legislature in 1937 also amended Articles 535 and 380, and repealed

Article 455, of the Revised Civil Statutes. See S. B. 158, adopted by the Regular Session of the 45th Legislature. However, the provisions of the Constitution and statutes in force at the time the events involved here occurred control this case. Section 16 of Article 16 of the Constitution, before its amendment, commanded the Legislature to enact general laws authorizing the incorporation of banks and providing for their supervision, regulation, and control by the State, which would protect and secure the depositors and creditors thereof. It also provided:

"Each shareholder of such corporate body incorporated in this State, so long as he owns shares therein, and for twelve months after the date of any bona fide transfer thereof shall be personally liable for *all debts* of such corporate body existing at the date of such transfer, to an amount additional to the par value of such shares so owned or transferred, equal to the par value of such shares so owned or transferred." (Italics ours.)

In the performance of the duty imposed by the Constitution, the Legislature enacted Article 535 of the Revised Civil Statutes, as amended by Acts 1929, 1st Called Session, Chapter 60, Section 1, which provided:

"If default shall be made in the payment of *any debt or liability* contracted by any bank, savings bank or Bank and Trust Company, each stockholder of such corporation, as long as he owns shares therein, and for twelve months after the date of the transfer thereof, shall be personally liable for *all debts* of such corporation existing at the date of such transfer, or at the date of such default, to an additional amount equal to the par value of such shares." (Italics ours.)

It is therefore seen that the liability of the shareholders was fixed by the provisions of the Constitution and statutes in general terms, and made the shareholders *"liable for all debts."*

■ A "debt," according to Webster, is "that which is due from one person to another, whether money, goods, or services; that which one person is bound to pay to another or to perform for his benefit; that of which payment is liable to be exacted; due; obligation; liability."

The courts of this State define the words "debt" and "liability," as used in the Constitution and statutes, in a general, and not in a restricted sense. In Barber v. City of East Dallas, 83 Texas 147, 18 S. W. 438, it was said: "In common parlance the word 'debt' is sometimes used to denote any kind of a just demand, and has been differently defined, owing to the subject

matter of the statutes in which it has been used; and while ordinarily it imports a sum of money arising upon a contract, express or implied, in its more general sense it means that which one person is bound to pay to or perform for another." In McNeal v. City of Waco, 89 Texas 83, 33 S. W. 322, this Court said that "the word 'debt,' as used in the constitutional provisions above quoted, means any pecuniary obligation imposed by contract; * * *." The definitions announced in the foregoing cases have been repeatedly followed by the courts of this State. City of Fort Worth v. Bobbitt, 121 Texas 14, 41 S. W. (2d) 228; Harbin v. Hood et al., 285 S. W. 838; Austin v. Cochran, 2 S. W. (2d) 1015. The decisions of the courts of this State in giving to the word "debt" a broad construction are in harmony with the holdings of courts in many other States. See Words and Phrases, 1st Series, Vol. 2, p. 1864 et seq., 2d Series, Vol. 1, p. 1226 et seq., 3d Series, Vol. 2, p. 817 et seq., 4th Series, Vol. 1, p. 671 et seq.

■ Article 535 used the term, "If default shall be made in the payment of any debt or liability contracted by any bank, * * *," the shareholders "shall be personally liable for all debts of such corporation * * *." It seems from the authoritative definitions of the two words "debt" and "liability" that the word "liability" has a more comprehensive meaning than the word "debt." Webster defines "liability" as follows: "That which one is under obligation to pay, or for which one is liable." In the case of Cochran et al. v. U. S., 157 U. S. 286, 296, 39 L. Ed. 704, 15 Sup. Ct. 628, the court said:

"We know of no definition of the word 'liability' either given in the dictionaries or as used in the common speech of men, which restricts it to such as are absolute, or excludes the idea of contingency. In fact, it is more frequently used in the latter sense than in the former, as when we speak of the liability of an insurer or a common carrier, or the liability to accidents or to errors."

■ It is our duty to construe the meaning of the income debenture in the light of the foregoing definitions of the words "debt" and "liability." The object of construing any written instrument is to ascertain the intention of the parties, and this intention must be determined, if possible, from the language used in the instrument itself. Astugueville v. Loustaunau, 61 Texas 233; Milliken v. County of Callahan, 69 Texas 205, 6 S. W. 681; Reynolds v. McMan Oil & Gas Co., 11 S. W. (2d) 778; Slaven v. James, 229 S. W. 317; Trinity Portland Cement Co. v. Lion Bonding & Surety Co., 229 S. W. 483; Trinity County Lumber Co. v. Ocean

Accident & Guaranty Corporation, 228 S. W. 114. See 10 Texas Jurisprudence, pp. 294, 295.

■ It is contended that it was the intention of the parties that relator would not expect payment of the $50,000.00 advanced on the debenture except from the net profits of the Bank, and since there were no net profits earned, the funds held by the respondents are not subject to the payment thereof. It is true that the debenture contains liberal language with respect to the payment of interest, and provides for a sinking fund for the retirement of the debenture prior to maturity. It is also true that Section 13 thereof sets forth the various acts which constitute a default; and it then provides that in the event of default the holder of the debenture "may declare the principal of all the debentures at the time outstanding to be forthwith due and payable, and thereupon such Debentures shall immediately become and be due and payable, together with all accrued and unpaid interest thereon."

It is undisputed that the Bank earned no net profits, and that it became insolvent and was placed in the hands of a receiver. In case of the liquidation of the Bank, all depositors and creditors of the Bank, except holders of indebtedness subordinate to the debenture, were entitled to be paid in full before any payments were to be made on the debenture. After such payments, the holder of the debenture was entitled to be paid from "all remaining assets of the Bank (including the proceeds of all assessments, penalties, judgments and other charges against the holders of capital stock of any class) until payment of the principal amount of such debentures and unpaid interest thereon," before any payment should be made on any indebtedness subordinate to the debenture or on account of any capital stock of the Bank.

We are asked to go beyond the language used in the debenture for a true interpretation of the intention and purposes of same. Under certain well-defined exceptions it is permissible to go beyond the language of an instrument for its true interpretation; but no such exceptions exist in this instance. The parties have with great pains and much particularity stated their purposes and intention in this debenture. It clearly shows that relator, as a governmental agency, was authorized to lend money to banks and take their debentures. The contract is elastic enough to meet certain needs and conditions, in that it exacts that the Bank shall make certain payments only out of its net earned profits. By specific words the parties have expressed their intention. All legitimate judicial inquiry to ascertain the correct interpretation of this instrument is clearly limited by the lan-

guage used therein, describing in much detail the objects sought to be attained. Every section was placed in this debenture for some purpose, and all of the sections should be considered in construing same. That construction should be adopted which will give effect to all sections of the debenture: Hearne v. Gillett, 62 Texas 23; Pennington v. Bevering, (Texas Com. App.) 17 S. W. (2d) 772; Hartford Accident & Indemnity Co. v. Neiman-Marcus Co., 285 S. W. 603; Spinks v. First Christian Church, (Texas Com. App.) 273 S. W. 815; Benskin v. Barksdale, (Texas Com. App.) 246 S. W. 360.

The language used in this instrument does not authorize courts to go elsewhere to find reasons for interpreting the debenture contrary to the terms used therein. We find nothing in this debenture which would justify the holding that when a bank becomes insolvent and is placed in the hands of a receiver, and all other liabilities except a debenture have been paid, and the receiver has in his hands certain funds, the holder of the debenture is not entitled to demand payment thereof. Furthermore, the claim has been presented to and approved by the respondent to the extent of $52,170.30. We find nothing in the language or the spirit of this debenture which authorizes any court to hold that it does not evidence a debt or liability within the meaning of the Constitution and statutes of this State, or that such debenture is not subject to payment out of the funds now held by respondent, derived from the assessments of stockholders and the assets of the Bank.

The writ of mandamus prayed for by relator is granted, and it is ordered that the respondent shall pay to the relator, out of the funds in his hands as Banking Commissioner of the State of Texas and statutory receiver for the Guaranty Bond State Bank of Miles, Texas, the sum of $13,253.75, as evidenced by the proof of claim filed with and approved by respondent; or so much thereof as remains in the hands of respondent after paying all costs and expenses of the liquidation of such bank.

Opinion delivered January 12, 1938.