**INGLE BROS. PACIFIC, INC., Appellant,**

v.

**H. L. SCOTT, Appellee.**

**No. 8230.**

Court of Civil Appeals of Texas, Amarillo.

March 13, 1972.

Rehearing Denied April 3, 1972.

Gibson, Ochsner, Adkins, Harlan & Hankins, Michael C. Musick, Amarillo, for appellant.

C. J. Humphrey, Amarillo, for appellee.

ELLIS, Chief Justice.

This is an appeal from a judgment entered in favor of H. L. Scott, plaintiff-appellee, against Ingle Bros. Pacific, Inc., defendant-appellant, arising out of the parties' written agreement for the sale and purchase of plaintiff's mop manufacturing business. Affirmed in part and reversed and rendered in part.

On June 16, 1969, H. L. Scott and Ingle Bros. Pacific, Inc., entered into a purchase agreement whereby Scott would sell to Ingle Bros. his mop manufacturing business known as Scott Manufacturing Company located in Amarillo, Texas. The purchase agreement is set out as follows: (paragraph numbers inserted for convenience of reference.)

"June 16, 1969

## "PURCHASE AGREEMENT

(1) "Ingle Bros. Pacific a California Corporation and Scott Manufacturing Co. a solely owned Proprietorship by H. L. Scott have entered into the following Purchase and Sale Agreement. Principals to be herein referred to as Ingle and Scott.

(2) "Scott agrees to sell all assets, trade names, manufacturing and marketing rights to Ingle. Ingle agrees to pay Scott $50,000 in the following manner . . .

(3) "$35,000 cash at time of transfer of title and, $15,000 on or before December 31, 1969. The $15,000 shall be a 7% note secured by assets of the business.

(4) "The physical assets shall consist of $19,000 in marketable inventory and accounts receivable combined, and all the equipment of the present business, no real estate.

(5) "An Employment Agreement has been prepared, wherein H. L. Scott will manage the business for a minimum of five years at an annual salary of $15,000, payable monthly, with a $3,000 increase after the 1st year, providing annual gross sales exceed $200,000.

(6) "A separate lease agreement shall be drawn between Mr. and Mrs. H. L. Scott and Ingle as follows; ten year lease at $550.00 monthly with option to renew for additional 5 years at $550.00 monthly plus tax increase over 1969 to be added.

(7) "Until legal operating status is determined, Scott will operate as a division of Ingle. Management will be directly responsible to Ingle. All operating policies shall be subject to Corporate Headquarters, Stellar Industries, of which Ingle is a subsidiary.

"/s/ H. L. Scott

"/s/ J. B. Tompkins"

Title to the assets of Scott Manufacturing Company was transferred by bill of sale on June 20, 1969, and the $15,000.00 note was executed and delivered on the same date with the due date of the note being December 31, 1969. When the note became due, the due date was extended to November 1, 1970, and thereafter was again extended to December 1, 1970.

After the transfer of title of Scott Manufacturing Company to Ingle Bros., Scott remained as an employee in charge of the Amarillo plant. Between the dates of November 24, 1970, and December 1, 1970,

Ray Rivero, the then General Manager of Ingle Bros., made it known to Scott that he had decided to close the Amarillo plant and move the equipment and operation to Tucumcari, New Mexico, and there combine it with another Ingle Bros. facility. Also, there was indication that Scott's duties would be altered to include sales work. The $15,000.00 note had not been paid and Scott did not desire that the equipment of the Amarillo plant be moved until the note was paid in full. Scott consulted with his lawyer concerning this matter. Scott's attorney contacted Rivero, advised him that the equipment was not to be moved until the note was paid, and secured an agreement to that effect from Rivero. On December 11, 1970, Rivero contacted Scott and inquired of him as to the financial status of the local account of Scott Manufacturing Company. Rivero indicated concern that the note be paid as soon as possible in order that the transfer of the equipment could be accomplished with the minimum amount of delay. Upon being advised by Scott that approximately $12,000.00 was available above the amount needed for payroll, Rivero instructed Scott to send $5,000.00 to Ingle Bros. headquarters in California and to write a check to himself for $7,000.00 and apply it on the $15,000.00 note. Scott sent the $5,000.00 to California but did not write a check for $7,000.00 to himself. Upon advice of his attorney, Scott did not take the $7,000.00, but it was determined to permit the account to build up to near the sum of $15,000.00 and then "clean it out." Scott did not advise Rivero or any representative of Ingle Bros. concerning his decision in this matter. Without consulting or advising his employer, on January 6, 1971, Scott had his wife, also an employee of Scott Manufacturing Company, to write him a check on the company account for $13,896.46 as payment on the $15,000.00 note and an additional check in the sum of $450.00 for "legal fees pertaining to note on Ingle Bros. Pacific."

On January 19, 1971, Rivero, having learned of the above described transactions, sent Scott a formal letter of termination of his employment. Scott then filed suit against Ingle Bros. Pacific, Inc., seeking, among other matters, the balance due on the promissory note and asserting breach of an alleged employment contract. Ingle Bros. challenged the existence of an employment contract and further took the position that in any event the termination was for good cause. The trial was held before a jury, and, upon the verdict, judgment was rendered in favor of Scott for (1) $305.00 for balance of principal and interest on the $15,000.00 note; (2) $2,250.00 for reasonable attorney fees; (3) $250.00 for the reasonable cost and expense in obtaining a default judgment in a previous proceeding; and (4) the net sum of $54,210.00 (after agreed discount) remaining to be paid Scott under the alleged employment contract.

Appellant raises no points of error and seeks no review of those portions of the judgment wherein the appellant recovered the above stated sums for balance due on principal and interest on the promissory note, the attorney fees and the costs and expenses in obtaining the default judgment. Therefore, these unchallenged portions of the judgment are affirmed, and we shall confine our consideration to the challenged part of the judgment awarding the appellee the net sum of $54,210.00 under the alleged employment contract.

Appellant has assigned 10 points of error with respect to that portion of the judgment upon which it brings this appeal and contends primarily that paragraph 5 of the purchase agreement of June 16, 1969, is not a valid employment contract between appellee and appellant. Appellee, on the other hand, contends paragraph 5 of the purchase agreement is a valid and enforceable contract of employment, relying primarily upon the following language found in that portion of said agreement designated as paragraph 5:

"An Employment Agreement has been prepared, wherein H. L. Scott will man-

age the business for a minimum of five years at an annual salary of $15,000, payable monthly, with a $3,000 increase after the 1st year, providing annual gross sales exceed $200,000."

Appellant, in its first point of error, complains of the trial court's failure to grant its motion for directed verdict. This point is predicated upon appellant's contention that as a matter of law no employment contract was in existence between the parties, and thus the submission of special issue number one inquiring as to whether "good cause" existed for the termination was unwarranted. It is uncontroverted that the parties executed the purchase agreement which contained paragraph 5. The parties are agreed that a separate written employment agreement had not then been prepared or was not thereafter prepared. Appellee does not contend there was an oral agreement of which paragraph 5 is a written memorial, or that the parties later agreed orally or in writing that paragraph 5 would serve as their contract. It is appellee's position that paragraph 5, in and of itself, is the employment contract between the parties.

This court has recently had occasion to examine the rules of law governing the determination of intent of the parties in construing a contract in the case of Sisk v. Parker, 469 S.W.2d 727 (Tex.Civ.App.—Amarillo 1971, writ. ref'd n. r. e.) where it was said:

"In the construction of a contract, the cardinal rule is to ascertain the intention of the parties as that intention is expressed in and determined by the language used in the instrument itself. Reconstruction Finance Corporation v. Gossett, 130 Tex. 535, 111 S.W.2d 1066 (1938), no matter what the actual intentions of the parties may have been. 13 Tex.Jur.2d Contracts, § 123."

The Supreme Court in American-Amicable Life Ins. Co. v. Lawson, 419 S.W.2d 823 (Tex.Sup.1967) stated:

"* * * It is the duty of the Court to construe the meaning of the language used in a contract. * * *"

A close examination of the entire purchase agreement, and paragraph 5 in particular, indisputably shows the parties' intention that the language in paragraph 5 is not to be considered as the employment contract by which both parties are to be bound. Paragraph 5 begins by stating: "An employment contract *has been prepared. . . .*" (emphasis ours), thus clearly indicating on its face an intention that any employer-employee relationship between appellant and appellee is to be governed by another written instrument. Paragraph 5 negates, by its own language, any intention that it, within itself, will be the employment agreement between appellee and appellant. It is undisputed, and the testimony clearly reveals, that a contract of employment, as mentioned in paragraph 5, had not been executed at the time the purchase agreement was signed. Therefore, since, at the time the purchase agreement was signed no contract of employment, in fact, had been prepared, the language in paragraph 5 could only mean, at most, that an employment agreement would be prepared at sometime in the future, and thus, could amount to nothing more than an agreement to agree. Language similar to that in paragraph 5 indicating that another instrument will control the employer-employee relationship between the parties found in other cases such as, "will agree" or "will agree to enter into an agreement to be written up within the next five days," has been generally held to create a contract to make a contract and in some instances, even the contract to make a contract has not been upheld as valid because of a lack of specification of the essential terms to be included in the final contract in contemplation of the parties. Betty Lee Shoes, Inc. v. Karl's Shoe Stores, Ltd., 293 F.2d 429 (5th Cir. 1961); Texas State Optical v. Caylor, 387 S.W.2d 461 (Tex.Civ. App.—Beaumont 1965, writ ref'd n. r. e.); Radford v. McNeny, 129 Tex. 568, 104 S.

W.2d 472 (1937); 1 Corbin on Contracts, § 29, pp. 61–71; Page & Wirtz Construction Co. v. Van Doren Bri-Tico Co., 432 S.W. 2d 731 (Tex.Civ.App.—Amarillo 1968, writ ref'd n. r. e.); Sisk v. Parker, supra.

A review of the purchase agreement of June 16, 1969, evidences that the instrument encompasses in broad outline from various areas of relationship contemplated by the purchaser's and seller's agreement, and that it was anticipated that the details relative to the significant areas were to be implemented and specifically governed by additional formal instruments. The formal bill of sale, as a separate instrument, sets out details evidencing the transfer of ownership not contained in the purchase agreement. The promissory note, as a separate formal instrument, sets out all of the details concerning the deferred payment of a portion of the purchase price. Paragraph 6 speaks of a lease agreement which would control their landlord-tenant relationship, and pursuant to such provision a separate formal lease agreement was drawn and executed. Likewise, it is apparent that the employer-employee relationship spoken of in paragraph 5 would be governed by another instrument drawn at a time other than that of the June 16th instrument. The record in this case fails to disclose the existence of any such "other" instrument regarding employment. Many significant and essential matters normally and logically contained in contracts of employment are not included in paragraph 5. For example, no provisions concerning conditions for termination were included. The very fact that the termination occurred in the particular manner that it did occur without reference to any matter prescribed in paragraph 5 is indicative that paragraph 5 did not encompass a most significant and essential matter for a contract of employment. Further, the schedule actually followed for the payment of salary, the plans for change of location of the employment as well as the change in the type of work to be performed by the employee were not encompassed in paragraph 5 of the purchase agreement upon which appellee relies as the employment contract. It is also here noted that appellee makes no claim for compensation for services performed prior to the formal termination.

From a review of the language of paragraph 5 in the light of the authorities dealing with the agreements of this character, it is our opinion that, as a matter of law, paragraph 5 cannot be properly construed as a enforceable contract of employment between appellant and appellee. Since we hold that the employment agreement to be entered into as contemplated by paragraph 5 was, in fact, never entered into, appellant's point of error number one must be sustained.

Appellant's remaining points of error deal, in the main part, with special issue submission relevant only in the event paragraph 5 of the purchase agreement is determined to be a valid contract of employment between appellee and appellant. Our decision that as a matter of law paragraph 5 is not an enforceable contract of employment, pretermits our passing upon appellant's remaining points of error.

Accordingly, we reverse and render that portion of the trial court's judgment awarding appellee relief under his breach of employment contract action. In view of our disposition of this case, under Rule 448, Texas Rules of Civil Procedure, we tax all costs occasioned by this appeal against appellee.

Affirmed in part and reversed and rendered in part.