C.C. BURNETT, Appellant,

v.

CHASE OIL & GAS, INC., et al., Appellees.

No. 12–83–0143–CV.

Court of Appeals of Texas, Tyler.

Nov. 21, 1985.

Rehearing Denied Dec. 31, 1985.

Michael Hatchell, Ramey, Flock, Hutchins, Jeffers, Crawford & Harper, P.C., Tyler, for appellant.

Dale Long, Gaylord Hughey, Sr., Otis Carroll, Trey Yarbrough, Conner & Gillen, J.W. Tyner, Tyler, for appellees.

BILL BASS, Justice.

This appeal contests the validity of a judgment dissolving a corporation and ordering distribution of its assets but omitting any specific provision for the satisfaction of any adverse judgment that might arise out of two lawsuits then pending against the corporation. Appellants also challenge the propriety of the award of attorney's fees to the corporation's attorney. We reverse and remand in part and affirm in part.

The dispute had its genesis in the voting deadlock between appellant C.C. Burnett (Burnett) and appellee Gaylord Hughey, Sr. (Hughey), the two shareholders of Chase Oil & Gas, Inc., also appellee (Chase). After the impasse persisted for a period that included two annual meetings of the corporation, Burnett brought suit under TEX. BUS.CORP.ACT ANN. art. 7.05 (Vernon 1980)[1] for the appointment of a receiver to rehabilitate the corporation. Hughey answered and filed a cross-action requesting

---

1. All references will be to the Texas Business Corporation Act unless otherwise noted.

the appointment of a receiver for the limited purpose of liquidating the assets and dissolving the corporation.

A receiver was appointed to attempt rehabilitation, but, after eighteen months capably managing Chase's affairs, the receiver concluded that rehabilitation of the corporation was not possible and recommended dissolution.

The receiver's report of February 1, 1983, indicates there were three lawsuits pending against Chase at that time. The receiver proposed to dispose of the suits in the following fashion: "The receiver proposes to assign ... the interest of CHASE OIL & GAS, INC. in the foregoing suits to the stockholders in their individual capacity." In its interlocutory order for liquidation of February 4, 1983, the court decreed that Chase's assets "be distributed in accordance with the receiver's plan of liquidation." In its final decree of May 24, 1983, ordering dissolution, the court simply directed that the prior order of February 4 "be implemented." Other than its approval of the receiver's proposal to partition the defense of the lawsuits and any resultant liability among the shareholders, the court made no provision for the satisfaction or discharge of the claims against Chase represented by the suits.

The record does not disclose the nature or scale of the lawsuits. It reveals only that Chase was in the posture of a defendant and that two suits were still pending at the entry of the final order.

Burnett's first three points of error complain the trial court erred in its final order of dissolution by failing to provide for satisfaction of the obligation of the pending lawsuits in violation of art. 7.09 A.

Whether a district court acting under art. 7.09 may order dissolution of a solvent corporation and distribution of its assets to the stockholders without payment and discharge or provision for payment and discharge of disputed or unliquidated claims in the form of lawsuits pending against the corporation is, so far as we can find, a question which has never before confronted a Texas appellate court. There is also a surprising dearth of decisions from other jurisdictions.

Section 7.09 A, which deals with involuntary dissolution, reads as follows:

> In proceedings to liquidate the assets and business of a corporation, *when* the costs and expenses of such proceedings and *all debts, obligations and liabilities,* of the corporation shall have been paid and discharged and all of its remaining property and assets distributed to its shareholders, or, in case its property and assets are not sufficient to satisfy and discharge such costs, expenses, debts, and obligations, when all the property and assets have been applied so far as they will go to their payment, the court shall enter a decree dissolving the corporation, whereupon the existence of the corporation shall cease. (Emphasis added.)

It is apparent that the resolution of the question turns upon the interpretation given "all debts, obligations and liabilities." Are pending lawsuits against the corporation included within the meaning of the phrase? Appellees argue for a definition of "debts, obligations and liabilities" that would limit its meaning to that of debt in its narrowest sense. Appellee's interpretation would exclude pending lawsuits and, by extension, any unliquidated, disputed or contingent claims. If dissolution must await final resolution of every unliquidated, disputed, or contingent claim, appellees argue that, in many cases, dissolution might never be possible. On the eve of the disposition of the last pending claim, another might be filed and so on ad infinitum. They conjure up the spectre of a corporation, which though having ceased to function, is forever denied its final rest because one claim still awaits adjudication.

On the other hand, appellant Burnett contends the court is without the power to order dissolution while lawsuits were pending against Chase. In Burnett's view, "debts, obligations and liabilities" include contingent claims "even though they may be remote." *New Jersey Title Guarantee*

*and Trust Co. v. Berliner,* 40 A.2d 790, 793 (N.J.Ch. 1945). At least, he says, some provision should have been made for their payment before the assets were distributed.

In construing the language of a statute, our courts are admonished to consider the entire enactment, not just its isolated parts, "keeping in view at all times the old law, the evil and the remedy." *Hunter v. Fort Worth Capital Corp.,* 620 S.W.2d 547 (Tex. 1981); TEX.REV.CIV.STAT.ANN. art. 10 (Vernon 1964). We are directed to consider the object the legislature sought to attain and to presume a just and reasonable result is intended which is feasible of execution. TEX.REV.CIV.STAT.ANN. art. 5429b–2. Therefore, the language of art. 7.09 must be read in connection with the other provisions of the Business Corporation Act, particularly its dissolution provisions, arts. 6.01–7.12. The court's task is to construe the statute so as to accomplish the purpose for its adoption.

The history of the evolution of our corporate laws clearly shows that the primary purpose of the statutory procedure for both voluntary and involuntary dissolution is the satisfaction of the corporation's creditors before the division of assets among the shareholders. Numerous judicial pronouncements reinforce this view.

The satisfaction of creditors before distribution of assets has been a fundamental equitable principle governing corporate liquidation and dissolution in every American jurisdiction. "The rule that creditors' claims must be satisfied before shareholders may participate in the distribution of a corporation's assets at the time of winding up is, perhaps, one of the most basic laws governing corporations." 8 Cavitch, *Business Organizations* § 190.05.

Even before the passage of statutes embodying this principle, Texas courts had fashioned equitable rules to protect creditors from the common-law rule that a cor-

poration's debts died with it. In 1925, the Commission of Appeals, in considering the effect of dissolution on a pending lawsuit, concluded:

It is quite plain that equitable rights and principles have been continually a part of the law of Texas, and that among these has always been the doctrine that the creditors of a corporation, upon its dissolution, have the right to be paid out of its assets with priority to its stockholders. *Lyon-Gray Lumber Co. v. Gibralter Life Ins. Co.,* 269 S.W. 80 (Tex. Comm'n App. 1925, judgmt adopted).

In the case of *A.R. Clark Investment Co. v. Green,* 375 S.W.2d 425 (Tex.1964), the Supreme Court said:

The rights of creditors with respect to the property and assets of a dissolving [2] corporation have always been recognized at common law and in equity as superior to the rights of shareholders. See *Panhandle National Bank v. Emery,* 78 Tex. 498, 15 S.W. 23; *World Broadcasting System, Inc. v. Bass,* 160 Tex. 261, 328 S.W.2d 863.

■ The Act's requirement of liquidation is the basic implement giving force to the policy of creditor protection. A narrow interpretation of "debts, obligations and liabilities" limiting its meaning to only liquidated debt is repugnant to the art. 7.09 mandate of liquidation before final dissolution. Liquidation, both in its ordinary sense and as used in the Act, means more than a mere division of assets and liabilities. It envisions the final wind up of the corporation's affairs. Liquidation, whether in the setting of the dissolution of a business entity, or the settlement of the estate of a decedent or bankrupt, implies the distribution of only net assets. Without discharge of liabilities or provision for their satisfaction, it would be impossible to know, or even fairly estimate, the size of the estate available for distribution. It cannot be complete while claims are pend-

---

**2.** Although often used interchangeably, the terms "liquidation" and "dissolution" should be distinguished as separate procedures. "Liquidation" is the process of settling or winding up the corporation's affairs. Dissolution refers to the formal termination of the corporation's existence. The order of their occurrence may vary.

ing and unsatisfied and no provision has been made for their satisfaction.

In *Farmers State Bank & Trust Co. v. Brady,* 137 Tex. 39, 152 S.W.2d 729 (1941), our Supreme Court had occasion to define "liquidate" as used in the statutes authorizing the State Banking Commissioner to take charge of insolvent banks "to liquidate the affairs of such insolvent bank":

> The term 'liquidate' as used in the statute means to 'determine by agreement or by litigation the precise amount of [indebtedness or damages]; or, where there is an indebtedness to more than one person to determine the precise amount of [each indebtedness]; ... to discharge; to pay off, as an indebtedness; to ascertain the amount, or the several amounts, of the liabilities of [a corporation, an estate, etc.], and apportion the assets toward the discharge of the indebtedness, as in winding up a corporation. *Webster's New International Dictionary.*

The court said the commissioners' duty was not complete "until all the assets of the bank have been disposed of and the proceeds thereof delivered to the ones legally entitled to the same." *Farmers State Bank & Trust Co. v. Brady,* 152 S.W.2d at 732.

The Commission of Appeals in *Lyon-Gray Lumber Co. v. Gibraltar Life Ins. Co.,* 269 S.W. at 82, compared corporate liquidation to an administration upon the estate of the old company:

> The proceeding is in the nature of 'an administration' upon the estate of the old company, and is doing, in a more convenient form, what a court of equity, with competent powers, might do; viz., making the common fund answerable for the debts, which were created on the credit of that fund.

▆▆▆ In determining what must be counted as liabilities in calculating the corporation's "estate," it is helpful to consider some of the items that must undoubtedly be numbered among its assets. Clearly, among the assets of the estate of a decedent are claims and causes of action. That they may be disputed does not absolve the administrator of his duty to pursue them. Similarly, a bankrupt's estate includes "all legal and equitable interests of the debtor in property." 11 U.S.C. sec. 541(a)(1). This includes existing rights of action. *In re Mortgageamerica Corp.,* 714 F.2d 1266 (5th Cir.1983). It seems undeniable that the corporate receiver has the duty to pursue the corporation's claims against others. Art. 7.07 B grants the receiver the authority to sue and be sued. Surely he may not abandon assets because litigation is required to secure them. The receiver is given the power to pursue to judgment the corporation's claims against others. Art. 7.07 B. So he must also defend against claims brought against the corporation by others. Just as the corporation may have assets which can only be established by suit, the statute implicitly recognizes that the corporation may have liabilities which will not be precisely ascertained without the aid of the courts.

If it is proper to include unliquidated claims and causes of action belonging to the corporation among its assets, logic and common sense dictate that unliquidated claims and causes of action against the corporation must be numbered among its liabilities. As the value of the former will be added to the fund available for creditors and stockholders at liquidation, so must the latter be deducted.

Other sections of the Act reinforce this view. Art. 6.04, dealing with voluntary dissolution, requires the corporation to "pay, satisfy, or discharge its liabilities and obligations, or make adequate provision for payment and discharge thereof." Art. 6.04 A(4) allows the corporation to apply for court supervision of the liquidation begun under this section. If the corporation completes voluntary liquidation, the Secretary of State will issue a certificate of dissolution only upon the submission to him of articles of dissolution setting forth that "all debts, obligations and liabilities of the corporation have been paid or discharged," or "that adequate provision has been made therefor." Moreover, the corporation must verify "that there are no suits pending

against the corporation, or that adequate provision has been made for the satisfaction of any judgment which may be entered against it in any pending suit." Art. 6.06 A(6). In an analogous context, it is noteworthy that the Banking Code orders the liquidator at the liquidation of an insolvent bank to "leave funds available for all nonclaiming depositors and creditors before paying a final dividend." TEX.REV.CIV. STAT.ANN. art. 342–815 (Vernon 1964). The Business Corporation Act's claim procedure mechanism also argues for the finality of court ordered and supervised dissolution intended by the legislature. Under 7.07 C, the court may require the filing of claims in the dissolution proceeding where, presumably, their validity may be decided and their amount precisely ascertained.

The strongest argument that "debts, obligations and liabilities" include pending lawsuits against the corporation is found in the plain meaning of the words. Although the statutory meaning cannot be decided simply by looking in dictionaries, history, context and judicial decisions confirm that a broad definition is appropriate.

Appellees would have us define the phrase as the equivalent of a liquidated and matured debt. However, the statute's use of the words "obligations" and "liabilities," in addition to "debt," demonstrates the legislature intended a wider meaning. There appears little, if any, difference in the meaning of obligation and liability. *Ellingson v. Walsh, O'Connor and Barneson,* Cal.App. 95 P.2d 185, 187. But "debt" and "liability" are not synonymous in ordinary usage or in law. Numerous decisions discriminate between the two terms. *Reconstruction Finance Corporation v. Gosset,* 130 Tex. 535, 111 S.W.2d 1066 (1938); *McElfresh v. Kirkendall,* 36 Iowa 224, 226; *Landreth v. First National Bank of Philadelphia,* 346 Pa. 551, 31 A.2d 161, 163; *Evans v. Kroh,* Ky. 284 S.W.2d 329, 331; *Wentz v. State,* 108 Neb. 597, 188 N.W. 467; *Goldenberg v. Wardell,* 92 F.2d 539, 542, 67 App.D.C. 388. The essential difference between the two terms apparent in the dictionaries and decisions is that while

a "debt" is generally held to be ascertained and certain, a "liability" may be unliquidated, disputed or contingent. *Blacks Law Dictionary,* Revised 4th Ed. (1968), quotes *Wentz v. State, supra:*

> The word liabilities is a broad term, and, while it may include debts, it is not generally limited to such term. In common speech, in contracts, and in judicial decisions, it is very frequently used, and has been referred to as of the most comprehensive legal significance, including almost every character of hazard or responsibility, absolute, contingent, or likely, and has been defined as the condition of being responsible for a possible or actual loss, penalty, evil, expense, or burden.

In *Reconstruction Finance Corp. v. Gosset, supra,* our Supreme Court was required to construe the then existing art. 535 of our civil statutes which dealt with stockholder liability in event of the bank's default in payment of any "debt or liability." The court found that the courts of this state had used the words "debt" and "liability" in a general, and not in a restricted sense, and that the word "liability" has a more comprehensive meaning than the word "debt." The opinion quoted the often cited U.S. Supreme Court opinion in *Cochran v. United States,* 157 U.S. 286, 15 S.Ct. 628, 39 L.Ed. 704.

In the Cochran case, Cochran was convicted of giving the comptroller a false report in which he did not list all his bank's liabilities. Cochran, in his defense, insisted that the promissory note he neglected to include in the report was not yet due, and, therefore, not a liability. In disposing of Cochran's argument, the Supreme Court said: "We know of no definition of the word 'liability,' either given in the dictionaries or as used in the common speech of men, which restricted it to such as are absolute or excludes the idea of contingency." *Cochran,* 157 U.S. at 296, 15 S.Ct. at 632.

In a different but closely related context, our law of fraudulent conveyances

provides that a debtor's transfer of his property for less than fair consideration is void as to his existing creditors, unless the debtor retains enough property subject to execution to pay all his existing debts. The existing creditors who may attack the transfer need not have been the owners of a fully matured and liquidated debt. The Act also protects the holders of unliquidated unmatured contingent claims. As used in the statute, existing creditors are "persons having subsisting obligations against the debtor at the time the fraudulent alienation was made or the secret trust created, although their claims may not have matured or even been reduced to judgment until after such conveyance." *First State Bank of Mobeetie v. Goodner*, 168 S.W.2d 941 (Tex.Civ.App.—Amarillo 1943, no writ). The Supreme Court of Texas described the type of claim protected in the case of *Frees v. Baker*, 81 Tex. 216, 16 S.W. 900, 901 (1891):

> The character of the claim, if it is just and lawful, is immaterial. It need not be due; for, although the holder cannot maintain an action until it is due, he nevertheless has an interest in the property as a fund out of which the demand ought to be paid. ... A contingent claim is as fully protected as one that is absolute.

It seems evident from a review of the cases that the statute's use of the words "obligations and liabilities," in addition to "debt," is not mere legislative redundancy, but intentionally expressive of a broader meaning than that urged by appellees.

It is predictable that a corporation, or its receiver, will sometimes disagree with the creditors as to both the validity and amount of the creditors' claims. The definition of "all debts, obligations and liabilities" advanced by appellees would, in effect, allow the corporation to distribute all its assets to its stockholders by the simple expedient of disputing all claims. It is argued by one of the appellees that creditors with unsatisfied predissolution claims may still follow the assets into the hands of the stockholders after dissolution by the invocation of the "trust fund" theory.[3] Even assuming this to be the law, it is still apparent that an agile, unscrupulous, or unfortunate stockholder could easily frustrate the creditors' efforts. The creditors' collection would be defeated to the extent that the stockholders no longer owned the distributed assets. If some shareholders still retained the distributed assets while others did not, the entire burden for the satisfaction of the claim would unfairly fall on those shareholders still retaining their share of the divided assets up to the full amount of the corporate assets distributed to them. At best, the creditors would be distressed by expense and delay.

Premature corporate dissolution to evade creditors, coupled with the probable intermediate insolvency of some of the stockholders, was precisely the problem that confronted Judge Story in *Wood v. Dummer*, 3 Mason 308, 30 Fed.Cas. 435 (1824). It was for the protection of creditors, who were the victims of much the same evil circumstances, that the courts, including those of Texas, expanded and applied the so-called "Trust Fund" theory propounded by Judge Story in *Wood.* The "trust fund" theory was an expedient fashioned and applied after the fact to correct injustice resulting from the distribution of corporate assets before the satisfaction of creditors. It was universally assumed that the liabilities of the corporation should have been satisfied in keeping with traditional notions of liquidation, that is, before the corpora-

---

**3.** "This doctrine provided that when the assets of a dissolved corporation are distributed among its shareholders, a creditor of the dissolved corporation may pursue the assets on the theory that in equity they are burdened with a lien in his favor. *See Koch v. United States,* 138 F.2d 850, 852 (10th Cir.1943).... Actually, the equitable doctrine has a much broader application. The trust fund theory applies whenever the assets of a dissolved corporation are held by any third party, including corporate officers and directors, so long as the assets are traceable and have not been acquired by a bona fide purchaser." Norton, Relationship of Shareholders to Corporate Creditors upon Dissolution: Nature and Implications of the "Trust Fund" Doctrine of Corporate Assets, 30 Bus.Law. 1061, 1074 (1975).

tion had been denuded of funds sufficient to pay its liabilities. The trust fund theory was not contrived as an option available to the corporation, but as a remedy for the benefit of creditors and to prevent unjust enrichment of the stockholders. The courts never imagined that the corporation should possess the right to knowingly disable itself from the ability to satisfy its obligations, leaving its creditors the dubious consolation of pursuing the corporate assets into the hands of the various shareholders. Neither do our corporate dissolution statutes admit such a result. They were designed first for the protection of creditors and then for the orderly and equitable division of the corporate assets among the stockholders. The trial court's order parcelling out the defense of lawsuits, along with the assets, is potentially subversive of both aims. It, in effect, renders the corporation insolvent while claims still pend against it. A transfer of assets without consideration so as to hinder, delay or prevent the payment of the grantor's existing creditors is condemned by our law as a fraudulent conveyance. Such a transfer is not improved by being styled a corporate dissolution. Nor does art. 7.09 sanction a result in involuntary dissolution proceedings condemned in every other context.

Art. 7.09 requires "all debts, obligations and liabilities" to be "paid and discharged." Appellees maintain that, if we adopt a definition of "all debts, obligations and liabilities" sufficiently comprehensive to cover the pending lawsuits, as well as other pre-dissolution claims, we admit a precedent that will subject corporations to the menace of being unable to dissolve. Before payment and discharge of all liabilities can be accomplished, they contend that other claims may be filed. It is argued that distribution might be interminably delayed and the stockholders of solvent corporations needlessly delayed in the enjoyment of their property.

The legislature presumably intended a result both fair and feasible when it passed the liquidation and dissolution provisions of the Texas Business Corporation Act. In construing the statute, we must be careful to adopt a construction that advances the statute's main purpose, the satisfaction of creditors. Nevertheless, we must be careful to avoid an interpretation that is needlessly oppressive to the stockholders or impractical in its result. Those sections dealing with voluntary dissolution specifically allow corporations to dissolve and distribute their assets after all debts, obligations and liabilities are paid or discharged or when adequate provision has been made therefore. The Secretary of State will issue a certificate of dissolution if it is certified to him that adequate provision has been made for the discharge of liabilities and that adequate provision has been made for the satisfaction of any judgment that may be entered against the corporation in a pending suit. It was assumed by the framers of the statute that the court supervising liquidation might also end the corporate existence and allow distribution after making adequate provision for unliquidated or disputed claims and pending lawsuits. There is no good reason why the court should be more restricted in its ability, or have less latitude to make adequate provision for the outstanding claims, than the officers of a corporation pursuing voluntary dissolution. The court would ordinarily possess a greater measure of objectivity and capacity to gauge what would constitute an adequate provision for the pending claims. The court will provide closer supervision in involuntary dissolution than that given by the Secretary of State in voluntary dissolution. The chance of fraud or error is not less, but greater, in the case of a voluntary dissolution as opposed to an involuntary or court-supervised dissolution.

The same view of the matter is implied in Chase's motion for adoption of plan of liquidation filed in the trial court. In its motion, Chase stated that "assets sufficient to cover outstanding liabilities should be withheld." In the same motion, Chase also asked for the adoption of a thirty-day plan of liquidation so that it might enjoy the benefits of sec. 333 of the Internal Revenue Code. To qualify, the code requires that liquidation be entirely complet-

ed within one month. The requirement is satisfied if cash is set aside, after the close of such month, for the payment of unascertained or contingent liabilities. 26 C.F.R. § 1.333–1(b)(1).

■ The liquidation and dissolution provisions of the Act, read together in the light of its history and purpose, evince a clear legislative determination that provision be made at liquidation for the satisfaction of all existing liabilities, both absolute and contingent, before distribution of the remaining assets, if any, to the stockholders. The lawsuits against Chase in the present case pre-exist dissolution. They are not post-dissolution claims such as were involved in *Hunter v. Fort Worth Capital Corp.*, 620 S.W.2d 547 (Tex.1981), and *Blankenship v. Demmler Manufacturing Co.*, 89 Ill.App.3d 569, 44 Ill.Dec. 787, 411 N.E.2d 1153 (1980). They are contingent only in the sense that they await adjudication. They fall within the definition of "debts, obligations and liabilities." This view is consistent with the ordinary meaning and legal usage of the terms. It is in conformity with equitable doctrines which have always governed corporate dissolution in this state. It is required by the commonly accepted definition of liquidation, and it is compatible with the procedure in the rest of the country. Appellant's points one through three are sustained.

Appellant's fourth and final point maintains the trial court erred in awarding attorney's fees as a legitimate claim against the corporation.

The record reveals that J.W. Tyner was the attorney retained by Chase in various transactions prior to this action. When Burnett filed this action for receivership against Chase and against Hughey, individually, Tyner filed Hughey's cross-action and Chase's original answer. Thereafter, the record is void of any representation of Hughey, individually, by Tyner. However, the record is replete with evidence that Tyner continued to represent Chase throughout the receivership and dissolution proceedings and in collateral matters. In fact, when the receiver for Chase was questioned regarding Tyner's representation, it was stated:

Q. [Tyner] Do you recall that I was the attorney of record for Chase Oil and Gas in this lawsuit when you got appointed?

A. [Receiver] Yes.

Q. And you didn't terminate me.

A. No.

Appellant further contends that there is an inherent conflict of interest in Tyner's representation of Chase while filing a cross-action for Hughey.

EC 5–18, TEX.REV.CIV.STAT.ANN. art. 320a–1, Title 14, art. 12 § 8 (Vernon 1973), states:

A lawyer employed or retained by a corporation or similar entity owes his allegiance to the entity and not a stockholder, director, officer, employee, representative, or other person connected with the entity. In advising the entity, a lawyer should keep paramount its interests and his professional judgment should not be influenced by the personal desires of any person or organization. Occasionally a lawyer for an entity is requested by a stockholder, director, officer, employee, representative, or other person connected with the entity to represent him in an individual capacity; in such case, the lawyer may serve the individual only if the lawyer is convinced that differing interests are not present.

When questioned about his representation of Chase, Tyner replied, "Primarily, I tried to espouse the best position for Chase Oil and Gas which very equally benefitted both of them [referring to Hughey]."

■ We believe from the record that the evidence shows Tyner represented Chase as its attorney of record and that the trial court was correct in awarding Tyner's fees to be paid by Chase. Accordingly, this point is overruled, and this portion of the judgment is affirmed.

The judgment of the trial court is affirmed in part and reversed and remanded in part.